Clerk will furnish counsel copy of the foregoing findings and conclusions.

In the Matter of **FLORIDA EAST COAST RAILWAY COMPANY, Debtor.**

In Proceedings for the Reorganization of a Railroad.

No. 4827–J.

United States District Court
S. D. Florida.
Feb. 13, 1959.

See also 137 F.Supp. 693, affirmed 227 F.2d 518.

Russell L. Frink and Harold B. Wahl, Jacksonville, Fla., for trustees.

John B. L'Engle, Jacksonville, Fla., for Florida East Coast Ry. Co.

John R. Turney and Turney & Turney, Washington, D. C., and Fred H. Kent, Adair, Ulmer, Murchison, Kent & Ashby, Jacksonville, Fla., for trustees of the Estate of Alfred I. duPont, deceased, and St. Joe Paper Co.

Charles Cook Howell and Howell & Kirby, Jacksonville, Fla., and R. B. Gwathmey, Gen. Sol., Atlantic Coast Line R. Co., Wilmington, N. C., for Atlantic Coast Line R. Co.

C. Harris Dittmar, Bedell & Bedell, Jacksonville, Fla., and Robert M. McCulloch, Appleton, Rice & Perrin, New York City, for Chase Manhattan Bank, formerly known as the President & Directors of the Manhattan Co. and J. Bryson Aird, as successor trustee, etc.

H. Plant Osborne, Osborne, Copp, Markham, & Ehrlich, Jacksonville, Fla., and P. B. Barringer, Jr., Jackson, Nash, Brophy, Barringer & Brooks, New York City for Guaranty Trust Co. of N. Y. and others, trustees, etc.

George W. Ericksen, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for F. K. Conn and others.

Morris L. Forer, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., and William D. Barfield, Jacksonville, Fla., for Protective Committee.

Henry L. Walker and William C. Bennett, Jr., Washington, D. C., for Southern Ry.

Walter H. Brown, Jr., Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, for Seaboard Air Line Ry. Co.

Lewis Petteway, c/o Florida Railroad & Public Utilities Commission, Tallahassee, Fla., for Florida Railroad & Public Utilities Commission.

Edward J. Hickey, Jr., Mulholland, Robie & Hickey, Washington, D. C., for Railway Labor Executives' Assn.

SIMPSON, District Judge.

By its Seventh Supplemental Report of November 3, 1958, and accompanying order, the Interstate Commerce Commission has approved a plan for the reorganization of the debtor railroad and has certified the same to this Court, in accordance with Sec. 77, sub. d, as amended, of the Bankruptcy Act (Section 205, sub. d, Title 11 U.S.C.A.). Within the

statutory period of 60 days from the date of that report and order, on December 1, 1958, Railway Labor Executives' Association (referred to herein as R.L.E. A.) filed its petition for reconsideration and modification of the report and order. A joint reply thereto by Atlantic Coast Line Railroad Company, Southern Railway Company, Seaboard Air Line Railroad Company, F. K. Conn, Protective Committee for Holders of Debtor's First and Refunding Mortgage Bonds, St. Joe Paper Company and the trustees of Alfred I. duPont testamentary trust was filed before the Commission on December 5, 1958. By its Eighth Supplemental Report and accompanying order, of January 12, 1959, the Commission reconsidered its previous report, denied the petition and adhered to its order of November 3, 1958.

By its order of November 26, 1958, this Court, as required by 77, sub. e, gave notice to all parties in interest of the time within which such parties might file with the Court their objections to such plan (fixed therein as January 12, 1959, and by this Court's order of January 12, 1959, extended to January 26, 1959) requiring the filing of detailed and specific objections in writing to the plan and their claims for equitable treatment. This notice was directed to all parties in interest, whether of record or not, and was published and circulated in a manner which the Court now finds to be sufficient. (See report filed herein December 22, 1958, and statement of trustees' counsel, page 4 of the Transcript of Proceedings of January 26, 1959). The order of November 26, 1958, likewise gave notice of the hearing contemplated by Section 77, sub. e, to hear all parties in interest in support of, and in opposition to such objections to the plan and such claims for equitable treatment, and fixed hearing thereon also for January 26, 1959. Such hearing, pursuant to such notices, was held on January 26, 1959 before the undersigned District Judge. Considered were the formal objections to the plan of R.L.E.A. (timely filed January 26, 1959, under the extended time fixed by the Court's order of January 12, 1959). Discussion of these objections and the Court's findings and rulings thereon are embodied herein (see infra, Objections of Railway Labor Executives' Association, page 9 hereof). Counsel for St. Joe Paper Company and for the testamentary trustees of the Alfred I. duPont Estate formally moved the approval by the Court of the plan of reorganization certified by the Interstate Commerce Commission to the Court by its Seventh Supplemental Report and order, and by its Eighth Supplemental Report and order. With the exception of R.L.E.A., each party in interest at the hearing, whether of record in this proceeding or not, joined in such motion. For reasons hereinafter set forth, the objections of the R.L.E.A. are found to be without merit and are accordingly overruled and denied.

#### Salient Features of the Plan.

Basically, the plan follows the stipulation filed before the Commission in June, 1958. The only notable departures are (a) the sinking fund provision for Series A First Mortgage Bonds, and (b) the provisions for the protection of employees. No party in interest has objected to the provisions for the sinking fund. The other provision, relating to employees is, as indicated above, adequately disposed of hereinafter.

The plan calls for internal reorganization of the debtor, with its management, and its assets (except for the so-called free assets, of a value of only $952,000) being turned over to first and refunding bondholders. As majority bondholder, St. Joe Paper Company will be majority stockholder of the reorganized railroad and will control it.

For good and sufficient reasons, the previous position of the Commission that St. Joe control would not be compatible with the public interest (see Fifth Supplemental Report, 282 I.C.C. 81, 120–121) is receded from, and St. Joe control is approved. This finding is supported by the record and is in accord with Commission decisions in two 1952 Section

5(2) applications (Arkansas & L. M. Ry. Co. Control, 282 I.C.C. 254, and Rockdale S. and S. R. Co. Operation and Control, 282 I.C.C. 297) applying the majority construction of the Supreme Court in United States v. Elgin, J. & E. Ry. Co., 298 U.S. 492, 56 S.Ct. 841, 80 L.Ed. 1300. The bare possession of "opportunity to influence shippers" is thereupon held not to violate the Commodities Clause (Section 1(8) of the Interstate Commerce Act, 49 U.S.C.A. § 1(8)).

Additionally, the "open gateway" (Jacksonville) and "neutrality" provisions of the St. Joe plan, supplemented as they are by the strong provisions in this respect of the Commission's order, including the consent injunction feature (which will be incorporated in the order) provide adequate protection to shippers and public. Public confidence in the new railroad will be strengthened by these self-imposed restraints, regardless of any necessity for them.

Under the plan the equities of the holders of the debtor's capital stock are found to have no value, and the stock interest will not participate in the distribution of either securities or cash. The stock has been recognized and consistently held by both Court and Commission throughout these proceedings to be of no value. The First Mortgage 4½% Fixed-Interest Bonds still outstanding will mature on June 1, 1959. These bonds will be redeemed at face amount from funds set aside for that purpose by this Court's order of January 10, 1956 (Document 1383, Reorganization Proceedings). The retirement of these bonds is not disturbed by the plan and will doubtless be accomplished prior to consummation of the plan. If not, retirement will be a very simple mattter as an incident of consummation.

With the elimination of the stock interest and of the First Mortgage 4½% Fixed-Interest Bonds, only three classes of creditors remain to be dealt with by the plan. They are: (a) holders of equipment trust obligations, (b) the owners of the First and Refunding 5% Mortgage Bonds, and (c) unsecured creditors. The plan contemplates the assumption by the reorganized company of the equipment obligations estimated to be $8,000,000. Holders of First and Refunding Mortgage Bonds will receive pro rata First Mortgage 5% Fixed-Interest Bonds, Second Mortgage 5½% Convertible Income Bonds, and common stock in the reorganized company. The package to be received by each $1,000 bondholder in exchange for his bond is one $500 First Mortgage 5% Fixed-Interest Bond, one $500 Second Mortgage 5½% Convertible Income Bond (interest, if earned, would be cumulative up to 16½%), and 32 shares of new common stock (par value $25 per share). In addition, if circumstances at the date of consummation permit, first and refunding bondholders will share pro rata in a distribution of the cash then in the debtor's treasury.

The authorized common stock is 2,340,000 shares with 900,000 shares reserved for ultimate conversion of the Second Mortgage Income Bonds.

Summarized, the capital structure of the reorganized company as set forth in the plan is as follows:

| | |
|---|---|
| Equipment obligations (to be assumed) | $ 8,000,000 |
| First mortgage 5-percent fixed-interest bonds | 22,500,000 |
| Second mortgage 5½-percent convertible income bonds | 22,500,000 |
| Total debt, approximately | 53,000,000 |
| Common stock issued in reorganization, 1,440,000 shares (par value, $25 per share) | 36,000,000 |
| Total capitalization, approximately | 89,000,000 |

Under this capital structure, annual fixed interest charges on the First Mortgage Bonds would be $1,125,000, which with approximately $250,000 interest on equipment obligations results in annual fixed charges of $1,375,000. Contingent interest charges on the Second Mortgage Income Bonds would be $1,237,500, resulting in total annual charges of $2,612,500. The plan further requires semi-annual payments, available net income permitting, into a sinking fund for retirement of First Mortgage Series A Bonds, the amount of such sinking fund payments being ½ of 1% of the aggregate principal amount of the Series A Bonds. This would result in semi-annual payments of $112,500 to the sinking fund, so that the total annual charges should be approximately $2,837,500.

The approved capital structure is within the permissible capitalization of not to exceed $90,000,000 found by the Commission to be reasonable and appears to be realistic in view of the relevant evidence before the Commission, including the value of the debtor's assets and its past, present and probable future earnings.

The plan delegates to the Court the allowance of unsecured claims and provides for their payment in cash pro rata from the amount which the Court finds to be the fair market value of the debtor's assets free of the lien of the existing first and refunding mortgage. The plan further finds that to the extent they are not thus satisfied such claims have no value and nothing shall be distributed therefor in the reorganization. This constitutes fair and equitable treatment of these claims, and detailed treatment of them is set forth hereinafter.

 The plan is to be executed, upon confirmation thereof by the Court, after submission to the classes of creditors affected thereby by the Commission, by the entry of an order appointing a board of three reorganization managers, one to be designated by St. Joe Paper Company, one to be designated by the Court to represent the minority bondholders, selected in such a manner as the Court may determine, and the third by the Court; all to be approved by the Court. I find that the plan adequately specifies the powers and duties of the reorganization managers and provides adequately for the consummation of the plan by such managers under Court direction.

### Miami Passenger Station.

 Under the plan, approval is given to the carrying out of the proposal for relocation and improvement of the debtor's Miami passenger and freight terminals as expeditiously as possible. The report finds that compliance with the State Commission's order for removal of the debtor's passenger station and the attendant relocation and reconstruction of facilities will not impair the ability of the bankruptcy trustees to perform their duties to the public, will not constitute an undue burden upon interstate commerce, will be compatible with the public interest, and will not interfere with the formulation and approval of a satisfactory plan of reorganization for the debtor. It further provides that to the extent not accomplished prior to consummation of the plan, the approved changes in the Miami passenger and freight terminal facilities shall be done as expeditiously as possible by the reorganized company.

Due note is taken of the amendment of sub-section c(2) of Section 77 by Public Law 85–824 (approved August 28, 1958), permitting the trustees of the debtor railroad, under certain conditions, to comply with lawful orders of the state regulatory body for needed improvements in railroad facilities prior to confirmation of a plan of reorganization.

At any time prior to confirmation of the plan, upon application by the trustees or other parties in interest, the Court will provide a time for hearing and disposition of proposals to implement the portions of the Seventh Supplemental Report dealing with the removal and relocation of the Miami passenger and freight facilities. For this purpose, consideration will be given to the intervention in these proceedings of political subdivisions of the State of Florida, includ-

ing Dade County and the affected municipalities. The Florida Commission, of course, is already present in the proceedings.

In short, as I construe the Commission's report and order, the Court is now authorized, subject to such further action by the Commission as may be required by the provisions of Section 1(18) of the Interstate Commerce Act with respect to the construction and/or abandonment of railroad facilities, to take immediate steps with respect to the Miami terminals. It is desirable, in my judgment, that this much-delayed matter proceed at once, and responsible proposals in this connection will receive prompt hearing and consideration by this Court.

### Objections of Railway Labor Executives' Association.

Exhibit A to the stipulation entered into by all parties to the Commission proceeding, including R.L.E.A., filed before the Commission June 26, 1958, proposed protection for F.E.C. employees as follows:

"None of such employees shall be deprived of employment or placed in a worse position with respect to compensation and seniority at any time during his employment because of the reorganization of the Florida East Coast Railway Company pursuant to such Plan of Reorganization and any program of economies undertaken by the reorganized company, including, but not specifically limited to, mechanization of maintenance of way work, installation of centralized traffic control, the modernization of the Miami or other terminals and relocation and reorganization of car and locomotive maintenance and repair work.

"3. No employee of the Florida East Coast Railway Company on the date of consummation of said Plan for Reorganization who accepts employment in the reorganized company shall be required to give up his home or move from his existing place of employment because of said reorganization or by reason of the effectuation of any program of economies as set forth in paragraph 2 above."

This was based generally upon provisions in the St. Joe-Seaboard-Southern Plan, but specifically upon testimony by Mr. Roger Main, President of St. Joe, before the Commission examiner, as to how it was proposed to deal with F.E.C. employees under St. Joe control if St. Joe's plan was adopted, and upon the examiner's findings in his proposed report.

The Commission refused to follow the stipulation in this respect (see pages 23, 24 and 25 of Seventh Supplemental Report) and by its Eighth Supplemental Report denied R.L.E.A.'s petition for modification and adhered to its original report and order.

■ The petition for modification raised only the question of Commission power to thus modify the stipulation, contending that the stipulation was an "agreement with a carrier" under the "notwithstanding" or concluding sentence of Section 5(2)(f) of the Interstate Commerce Commission Act, 49 U.S.C.A. § 5(2)(f).

This question is again raised by R.L.E.A.'s first ground of objection before this Court. The language of Section 5 (2)(f) may not be tortured to cover this stipulation as being an agreement entered into by "any carrier or carriers by railroad and the duly authorized representative * * * of employees." The Commission did have statutory power to modify the stipulation in this regard.

■ The Commission found that conditions for protection of employees should follow those embodied in the New Orleans Agreement. (New Orleans Union Passenger Terminal case, 282 I.C.C. 270) and that the imposition of such conditions will be fair and equitable to the interests of employees, and not unduly burdensome to the reorganized company.

It found that the stipulated restrictions could result in burdensome and intolerable obligations which might seri-

ously handicap the reorganized company in effectuating more efficient and economical operations, even in periods of stress and regardless of the necessity therefor, and in the event of a severe depression might lead to insolvency of the reorganized company. The findings continue:

"Approval of provisions of such nature would discourage rather than promote more economical and efficient operations by the reorganized company and, in our opinion, would be contrary to the expressed national transportation policy to promote economical and efficient service and sound economic conditions among the several carriers.

"We see nothing in the circumstances of this case which would warrant our burdening the reorganized company, upon its emergence from reorganization, with restrictions and burdens for the protection of employees more onerous than we customarily have found to be fair and equitable incident to the approval, under the provisions of sections 1(18) and 5 of the Interstate Commerce Act, of transactions involving financially strong carriers."

Boiled down, the Commission conclusion is that the stipulated provisions are not necessary for employees' protection and would constitute an unnecessary burden on the reorganized company.

Concededly, these findings fall within the "public interest" field of acknowledged Commission leadership, but the R.L.E.A.'s second, third and fourth grounds of objection assert they are arbitrary, capricious, an abuse of discretion, and not only without support in the evidence, but directly contrary to all the evidence before the Commission examiner, and are unfair and inequitable. If this is so, the plan will have to go back to the Commission. It cannot be re-written by the Court which has no power, directly or indirectly to amend it.

These objections are plausibly and convincingly argued in R.L.E.A.'s excellent brief. The relevant evidence is mainly the R.L.E.A.-A.C.L. stipulation filed before the examiner stipulating to practically the same terms in the event of Commission adoption of the A.C.L.-F.E.C. plan, and the testimony of Mr. Main committing St. Joe to similar employee protection under St. Joe control. The greatest number of jobs to be eliminated under contemplated improvements is in the proposed mechanized maintenance program, affecting 346 employees. The testimony of Accounting Officer Lane, of the debtor, is that there is a labor turnover among these employees of 37.8% per year, equivalent to a 100% turnover in less than 32 months, well within the 4-year period guaranteed under the provisions imposed by the Commission's order. Certainly the Commission had no direct evidence in the record before it from any one that the stipulated provisions for protection of employees would be unduly burdensome upon the reorganized company, or might lead it into serious financial trouble, but it should be emphasized that before the Commission was a record containing hundreds of exhibits and thousands of pages of testimony dealing with the past, present and future financial prospects of the debtor and its ability to survive under reorganization.

In any event, I do not consider the presence or absence of direct testimony upon these subjects determinative. In this field, the Commission is entitled to draw upon its long experience and its own expert knowledge, acquired both in its regulation of railroad carriers, and in its reorganization of many of the country's railroads. Instead of being arbitrary and capricious, the Commission's findings are entered in enlightened consideration of long experience, and in due deference to expressed national transportation policy to promote economical and efficient service and sound economic conditions among the several carriers. Here I find, not an abuse of discretion, but the exercise of an enlightened discretion. The findings of the Commission in this respect may be considered as the equivalent of an expert opinion such as is ex-

pressed by expert witnesses in their recognized fields before every trial judge in the trial of all types of law suits. The reasons assigned by the Commission for its decision are valid reasons, fairly supporting the conclusion reached.

The provisions dealing with protection of employees in the plan of reorganization as proposed by the Commission in its Seventh and Eighth Supplemental reports are found to be fair and equitable to the employees of the debtor company, and in the public interest.

The plan certified by the Commission in prescribing the terms of the New Orleans Agreement simply provides minimum requirements for the protection of employees. The Commission's Eighth Supplemental Report, page 6, emphasizes that the making of further agreements between representatives of employees and the management of the reorganized company when established is in no way prevented. With or without an agreement, the granting of greater benefits including those described by the witness Main, speaking on behalf of the controlling stockholders of the reorganized company, is in no way limited. Counsel for the St. Joe Paper Company and the duPont Estate stated before this Court (page 19, Transcript of January 26, 1959 Proceedings):

"Now, I should state at this point, Your Honor, that the testimony given by Mr. Main was given in good faith. There is no disposition in any way upon the part of Mr. Main or the St. Joe Paper Company to reduce or change or minimize or qualify his testimony. To the extent that that testimony is binding upon those parties in the future operation of this property, it is still in force and effect. We are not renouncing it in the slightest degree, * * *"

In its reply (filed January 28, 1959) to the R.L.E.A. objections, which the Court construes as a pleading in this proceeding, the statement is made:

"The original statement by Mr. Main was made voluntarily on direct examination and not as a result of any agreement or stipulation with the Employees' representatives or anyone else. It was an amplification of the policies of the duPont Estate which were set forth in Mr. Ball's testimony in 1945 (Tr. 3, 4, 5, 6)."

St. Joe and duPont counsel have set a record in this proceeding that Mr. Main's testimony constitutes a binding commitment upon that company and that estate. No justification is presented for the Court to attempt to enforce that commitment in the only way it can conceivably be enforced in these proceedings, viz., by a refusal to approve the plan and a re-reference to the Commission.

R.L.E.A.'s objections will be overruled and denied in the accompanying Order.

### Validity and Rank of ACL Claims.

Counsel for Bondholders Protective Committee urges that the unsecured claims of the Atlantic Coast Line (obtained by assignment from the trustees of the Bingham will and from the Florida East Coast Car Ferry Company) totaling $1,900,000, should either be disallowed, or should be reduced in rank below the other unsecured creditors. These claims accrued prior to receivership and were filed by the original claimants in the receivership, not objected to by the receivers, re-filed in these proceedings and accepted without objection by the bankruptcy trustees. They have been treated throughout by all parties to the receivership and herein as valid unsecured claims, although their acquisition by Coast Line for a total outlay of $5,000 (plus 50% of any amount collected on them) has been the subject of considerable argument before this Court, before the Court of Appeals for the Fifth Circuit, and before the Interstate Commerce Commission as to whether Coast Line thereby became a "party in interest" in the proceedings. The position of Coast Line, as such party in interest, is already specifically decided by this Court and by the Court of Appeals in these proceedings. Not until

this hearing, has any attack on the validity of these claims been asserted nor has any attempt been made to relegate them to a lower rank than the other unsecured creditors.

Counsel refers to the receivership record, particularly Volume 4, Document 452, showing the origin of the claims being advances made by the Bingham trustees (sole owners of the stock interest in F.E.C.) and another wholly owned subsidiary, Florida East Coast Car Ferry Company, to the failing F.E.C., at a time when it was insolvent. It is urged that this was the type of dealing which led the Supreme Court of the United States in the Deep Rock Oil Corporation case (Taylor v. Standard Gas and Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, a 77-B reorganization) to castigate as unconscionable the wrongful and injurious conduct of the controlling corporation in the mismanagement of the bankrupt's affairs, and to hold the District Court in error for refusing to reject the plan of reorganization. Decisions following Deep Rock are numerous. I consider them inapposite.

The receivership record shows, testimony by Mr. Jackson in this hearing confirms, that the best interests of F.E.C. were in turn dear to Mr. Flagler, Mrs. Mary Lilly Flagler Bingham, and to her testamentary trustees. Concern for the future of the enterprise was expressed in both the will of Henry M. Flagler and that of his widow. Mrs. Bingham's testamentary directions in this respect, while finally held by the New York Supreme Court, Appellate Division, not to require further advances or contributions by the Bingham trustees, received the opposite construction by the trial division. The opinion of Mr. Justice Levy (trial division) is valuable for its carefully detailed account of the background and history of the railroad, and of the dealings with it by the Flaglers and the Bingham testamentary trustees. The record contains no basis for a charge of overreaching or unfair dealings. It is convincingly to the contrary.

In the situation here present, if the doctrine of laches does not bar an attack on the origin of these claims, certainly their long acceptance and treatment in this and the preceding litigation as proper and legitimate claims against the bankrupt by receivers, reorganization trustees, other bondholders, Court and Commission, cast the burden of establishing their initial invalidity upon the party asserting it, viz., the Bondholders Protective Committee. I am convinced that this burden has not been met and, therefore, find that the Atlantic Coast Line unsecured claims in the amount of $1,900,000 are valid, and further find that they are entitled to rank equally with the other unsecured claims.

### Other Unsecured Claims.

No question is raised as to the validity of any of the remaining unsecured claims, and to their right to participate pro rata in the distribution of the free assets, (see Free Assets, infra, page 18). These claims are as set forth in the report respecting the same filed by the reorganization trustees herein December 18, 1958. The combined total of unsecured claims is found to be $2,535,561.74. This means that the unsecured claimants participate in free assets upon a percentage ratio to the extent of 37.6% of their claims, or $.376 of payment for each dollar of claims. This percentage is the ratio which the total value of free assets bears to the total amount of unsecured claims.

### Free Assets.

Judge Sibley's opinion and order of March 23, 1949, Volume 6 Reorganization Proceedings, Document 758, with respect to free assets, is binding in this case as to each of the assets determined to be "free" in his order. These assets have an appraised value as of October 31, 1958, of $932,866 under an appraisal procured by the reorganization trustees as of that date. (See Trustees' Report filed December 18, 1958). These assets consist of real estate appraised at $167,716 and stocks and evidences of debt appraised at $765,150.

Since the date of Judge Sibley's order, out of sales of forty or fifty parcels of land by the trustees, sales of six parcels require consideration to determine whether or not they were sales of free assets. The orders for each of these sales, by appropriate provisions, deferred consideration of this question. As to each of these parcels, the facts surrounding both purchase and use are virtually similar to the history of other tracts found to be free assets by Judge Sibley's order. These tracts are dealt with in the Trustees' Report referred to and were discussed at this hearing (see Transcript of this hearing, pages 131–146). Without objection of any interested party present or represented at this hearing, the Court stated that the money received from the sale of these 6 parcels, totaling $20,516.67, would be added to the appraised value of the free assets dealt with by Judge Sibley, making a free assets total valuation of $953,382.67. As stated, a portion of this is real estate, a portion of this is stock and evidences of debt, and a portion of it is cash. These assets will be acquired by the reorganized company, and cash in this amount will be distributed pro rata among the unsecured creditors, (see Other Unsecured Claims, supra, page 17). In its submission of the plan to creditors, the Commission is directed to submit to each unsecured creditor (as listed in the Trustees' Report of December 18, 1958) for acceptance or rejection, the distribution of this fund pro rata to the unsecured creditors by paying 37.6% of each claim. Since first and refunding bondholders are the owners of the unsecured claim for $487,413.13, an additional question to be embodied in the submission to each first and refunding bondholder is whether or not he accepts or rejects the indicated pro rata distribution of free assets.

### Participation of Accrued Interest as Unsecured Claim in Distribution of "Free Assets" Denied.

Consideration has been given to proposals that accrued interest, including interest on unpaid coupons, be allowed as unsecured claims, and that payment thereof be made on a pro rata basis to first and refunding bondholders from the "free assets."

This in effect calls for the finding of a deficiency of about $33,000,000 between the value of what the bondholders, as secured creditors receive (in bonds and stock of the reorganized company) and their total claim, including such accrued interest. The position is urged that the security pledged under the mortgage was not merely physical assets but earnings, and that earnings were diverted to other purposes during reorganization. This argument overlooks that such diverted earnings were diverted under Court order to preserve and protect the principal security, an operating railroad, while the road was in bankruptcy.

Reliance is placed upon the Fifth Circuit case of Georgia, Florida & Alabama R. Co. v. Bankers Trust Co., 170 F.2d 733, by both sides. As I read and understand Judge Sibley's opinion, he is dealing with the respective rights of bondholders and preferred stockholders, and holds that Vanston Committee v. Green (329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162) does not prevent the allowance of simple interest on bonds precedence over the preferred stock. Some of his language is of interest in the present situation [170 F.2d 734]:

> "Ordinarily all classes of stockholders of an insolvent corporation have no right or equity till all creditors are satisfied. But there may be exceptional cases in which a creditor may have disentitled himself to claim interest, as by delaying and obstructive conduct. Interest on interest has especially met with general disfavor. See 30 Am.Jur., Interest, Sect. 55, and concurring opinion in the Vanston case. It was such interest that was there held not allowable. That kind of interest is not involved in this appeal. There are no unsecured creditors in this case. The issue is between secured bondholders and the debtor corporation and its stockholders."

When the Georgia, Florida & Alabama R. Co. case was finally terminated by

Judge Davis in the Georgia Middle District Court, interest on interest was sought to be allowed ahead of the preferred stock. See the concluding portion of his opinion (88 F.Supp. 796, at pages 801, 802 and 803), particularly the following language at page 803:

"If this Court were now to allow interest on past due interest, such allowance would wipe out all interest of the First Preferred Stockholders under the Plan of Reorganization of the Debtor, heretofore approved, and would exclude them from participation in the Plan."

Judge Davis disallowed interest on interest, and permitted preferred stockholders to receive 2,500 shares of stock in the reorganized Georgia, Florida & Alabama R. Co.

This Court has specifically held, in Loftin v. Fahs, D.C. (123 F.Supp. 404), that matured interest coupons upon the first and refunding bonds of the debtor are a valid indebtedness of the taxpayer, and that accrued interest on the unpaid coupons is a valid obligation of the debtor and is interest upon indebtedness. (This holding was the basis for the allowance of deductions from gross income for income tax purposes for 1947 and 1948, resulting in net operating losses, which were carried back to 1945 and 1946 under the carry back provisions.) The debtor in this litigation recaptured over $4,000,000 in taxes and interest from the collector.

The holding was affirmed on appeal to the Fifth Circuit (reported as Fahs v. Martin, 224 F.2d 387), in a carefully prepared opinion by Judge Tuttle. His appraisal of the meaning of the Vanston case is consistent with Judge Sibley's in the Georgia, Florida & Alabama R. Co. case (supra). His conclusion is that Mr. Justice Black (in Vanston) uses "allowance" in a loose, not a technical sense, and is actually referring to distribution of assets (see page 165 of 329 U.S., at page 241 of 67 S.Ct.). Allowance of a claim is based upon legal considerations, its rank in a distribution of assets must be based upon equitable principles.

The overall equities in the present case are such that I conclude that the claims for accrued interest of the first and refunding bondholders should not be allowed to participate in the "free assets" distribution. Their claim is a valid obligation of the debtor, as heretofore recognized, but is relegated to inferior rank, below the unsecured creditors. Denial of participation in the "free assets" is tantamount to extinction of these accrued interest claims, for the railroad, its physical properties, cash and all other assets are all delivered to these same bondholders under the security of their mortgage.

Putting a claim for $33,000,000 down for equal distribution of a fund of $952,000 with other claims totaling only $2,500,000 (actually only $2,000,000 plus, since these bondholders own one claim of $487,000), is putting a whale in a minnow pool.

The additional amount sought to be received by each bondholder was characterized as "de minimis" by counsel for the Bondholders Protective Committee, and is indeed, infinitesimal. But the other unsecured creditors' receiving roughly one-thirty-sixth of their claims, as opposed to roughly nine-twenty-fifths of their claims (as will now be their participation) would take their all. The balancing of equities is not accomplished by such terrific imbalance.

I am not disposed, by a stroke of the pen, to wipe out the struggles and the battle that accompanied the establishment of the "free assets." Actual extinguishment of the long-recognized unsecured claims is impossible; their virtual extinguishment, by shrinkage in comparison with this huge claim of the bondholders, is refused, as inequitable.

### Approval of the Plan.

The plan is found to comply with the provisions of Section 77, sub. b as amended of the Bankruptcy Act and is found to be fair and equitable, and the Court is of the opinion that the plan must be approved. To the extent applicable, the reasons for the adoption of the plan set forth in the Seventh and Eighth

Supplemental Reports of the Commission are adopted by the Court as the basis for its approval of the plan.

### Order Approving Plan of Reorganization.

The Plan of Reorganization (herein called the plan) for the debtor was approved by the Interstate Commerce Commission (herein called the Commission) by its Seventh Supplemental Report and Order dated November 3, 1958, and upon reconsideration thereof, adhered to by the Commission's Eighth Supplemental Report and Order dated January 12, 1959. The plan, by reference thereto, is incorporated in this order.

By order of this Court, dated November 26, 1958, a hearing was held on the plan, and related matters, on January 26, 1959, after due notice to all parties of record, and after published notice to all parties in interest, whether of record or not. Oral arguments were heard, and briefs have been filed. In consideration of the entire record in the proceedings, the transcript of all hearings before the Commission and its examiner, the exhibits there produced, the objections of Railway Labor Executives Association to the plan, the motion for approval of the plan joined in by all other parties present or represented, the evidence produced at the hearing, the arguments and briefs submitted by counsel, the memorandum opinion approving the plan filed by the Court contemporaneously with this order,

The Court finds:

1. The findings and conclusions stated by the Commission in its Seventh and Eighth Supplemental Reports and Orders (dated respectively November 3, 1958 and January 12, 1959) are supported by evidence, are in accord with legal standards, are correct in fact and law, and are adopted as findings and conclusions of this Court, as fully and to the same extent as if set forth at length herein.

2. The plan:

(a) includes provisions modifying and altering the rights of creditors of the debtor;

(b) provides for fixed charges in such an amount that, after due consideration of the probable prospective earnings of the property, in the light of its past earnings, experience and all other relevant facts, there will be adequate coverage of such fixed charges by the probable earnings for the payment thereof;

(c) provides adequate protection and fair and equitable treatment for employees of the debtor;

(d) provides adequate means for the execution of the plan; and

(e) in all other respects complies with the provisions of Section 77, sub. b of the Bankruptcy Act, as amended (Section 205, sub. b, Title 11, U.S.C.A.).

3. The plan is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; the appropriate amounts to be paid by the debtor or by the corporation acquiring the debtor's assets for expenses and fees incident to the reorganization have been fully disclosed so far as they can be ascertained at the date of this hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits as to be subject to the approval of the Court; the plan properly provides for the payment of all costs of administration and all other allowances made or to be made by the Court.

4. This Court has jurisdiction of the subject matter of these proceedings and of the debtor and its properties, creditors and stockholders, and all other parties having claims against or interests in the debtor or its properties.

5. The unsecured claims against the debtor's free assets include the claims of Atlantic Coast Line Railroad Company in the total of $1,900,000 and the total amount of all such unsecured claims entitled to participate in distribution of free assets is $2,535,561.74, as set forth

in Trustees' Report of December 18, 1958. The cash value of the free assets is $953,382.67. The holders of unsecured claims shall be paid in cash at the rate of 37.6%, or $.376 in payment for each dollar of claim.

6. The accrued interest upon First and Refunding 5% Bonds is a lawful obligation of the debtor, but upon equitable principles, is not entitled to equal rank with the other unsecured claims in the distribution of free assets of the debtor. This relegation of this interest claim to inferior rank means that there is no fund from which it can be paid, in whole or in part, and it is not to be given further consideration in the reorganization.

7. Pages 10 and 11 of the Commission's order accompanying the Seventh Supplemental Report (styled "R. Maintenance of Open Gateways") contain provisions that acceptance of the plan by St. Joe Paper Company and the trustees of the Alfred I. duPont Trust shall be conclusive evidence of their acceptance and agreement to abide by certain conditions numbered (1) through (7) with respect to the maintenance of open gateways. (7) is a consent to injunctive provisions of this order enjoining these parties, or either of them and their trustees, officers and directors, from violating this condition and any and all provisions thereof. This order should contain such an injunction.

8. The foregoing findings shall be taken and deemed to be findings of fact, and in addition, to the extent appropriate, conclusions of law, and orders.

Whereupon, it is Ordered:

First: All objections heretofore filed or urged herein to the plan, and all claims heretofore filed or urged herein for equitable treatment otherwise than through the plan and this order are hereby severally overruled and denied.

Second: The plan is hereby in all respects approved.

Third: The submission by the Commission to holders of unsecured claims for participation in the distribution of free assets shall be to the claimants de-

scribed and in the manner set forth in numbered Paragraph 5 of the above findings.

Fourth: The plan shall be submitted by the Commission in accordance with the provisions of Section 77, sub. e. of the Bankruptcy Act, as amended.

Fifth: From and after the date of this order, St. Joe Paper Company and the testamentary trustees of the Alfred I. duPont Trust, and each of them, their trustees, officers and directors are forever enjoined from violating the undertakings set forth in detail on Pages 10 and 11 of the Commission's order accompanying its Seventh Supplemental Report, in numbered sub-paragraphs (1) through (6) of Paragraph R of said order entitled "Maintenance of Open Gateways". Said Paragraph R of said order is incorporated herein by reference as fully as if set forth at length.

Sixth: The Court reserves full jurisdiction to construe the plan, to cure any defect, supply any omission, and reconcile any inconsistency and to exercise all its power under the plan, all in such manner and to such extent as may be necessary or expedient in order to consummate the plan.

Seventh: The Court reserves full jurisdiction for the purpose of finally fixing amounts to be paid as compensation and expenses under the provisions of the plan, under the provisions of this order, and under such further orders as the Court may enter in that respect.

Opinion and Order Respecting Designation of Reorganization Managers.

At the close of the hearing held in this matter, pursuant to notice, on January 26, 1959, for the purpose, together with related matters, of considering for approval by the Court the plan of reorganization approved by the Interstate Commerce Commission in its Seventh and Eighth Supplemental Reports and Orders pursuant thereto in Finance Docket 13170, St. Joe Paper Company and the testamentary trustees of the Alfred I. duPont Trust presented their "Petition of St. Joe Paper Company et al. With

Respect to the Designation of Reorganization Managers."

■ This petition, in effect, asks for the Court either concurrently with approval of the plan or shortly thereafter, to fix a date for submission of nominations of reorganization managers pursuant to provisions of the plan, and thereupon to set a hearing date for the purpose of entering an order appointing and designating reorganization managers. The plan provides:

"The plan shall be carried out, effected, and consummated by a board of three reorganization managers, to be designated in the following manner: one by St. Joe Paper Company, another by the court to represent the minority bondholders (holders of the debtor's first and refunding mortgage bonds not affiliated nor connected with St. Joe Paper Company), selected in such a manner as the court may determine, and the third by the court; and all to be approved by the court."

The proposal of St. Joe and the duPont testamentary trustees was supported at the hearing by all the bondholders present and by the successor trustees of the first and refunding mortgage. Persuasive reasons are advanced for the naming of reorganization managers at this time rather than after the submission of the plan to the creditors of each class by the Commission (under Section 77, sub. e) and the certification of the results of such submission to the Court by the Commission. Briefly stated, they are: that acceptance by the required two-thirds of the creditors in each class to which submission is required is a foregone conclusion; that the receivership and bankruptcy of this debtor now total about 28 years and the interests of security holders and the public interest require as speedy reorganization as possible; and that months of valuable time can be saved by reorganization managers now proceeding in a preparatory way with their duties of reorganization. The saving of several months time in both the Missouri Pacific and the St. Louis-San Francisco reorganizations by the use of similar procedure is cited in oral argument.

I am informed also that in both the Erie and Northwestern reorganizations, parties entitled to designate reorganization managers did so informally prior to confirmation of the plan, but the designation was not filed with or accepted by the Court until after confirmation. In these cases, the managers-to-be used the interval between approval and confirmation to retain counsel and other agents and work toward ultimate consummation of the plan. Such work, so far as compensation out of the estate was concerned, must have been at the risk of the parties, and if the plans had not been ultimately confirmed, a serious question as to the right of compensation might have been presented.

Counsel for St. Joe recognizes the possibility of complications of this nature by suggesting (see Page 154, Record of January 26, 1959 hearing) that a suitable caveat against the contingency that the plan might not be confirmed could be included in the Court's order. This is taken from the St. Louis-San Francisco reorganization case [In re St. Louis-San Francisco Ry. Co., D.C.E.D.Mo., 68 F. Supp. 921]. It would provide in effect that no expense incurred by the reorganization managers or any counsel who may be selected by them, and no compensation of such counsel shall be chargeable against the estate of the debtor in the event that the plan shall not be finally confirmed, except to the extent that the Court may hereafter find that the services so rendered and the expenses so incurred shall have been and are beneficial and are made use of in the carrying out of any other plan of reorganization which may be finally confirmed herein.

This suggestion is also tacit recognition of the fundamental proposition that until confirmation there is no plan in effect under which the reorganization managers, whether formally or informally designated, can properly act or bind anyone. Nevertheless, perhaps if there were no other difficulties present, such a plainly posted "proceed at your own risk"

warning would be sufficient, and I should take the requested action at this time.

But, the most serious consideration is the propriety of the sitting Judge in effect deciding in advance of its presentation to him the question which the statute contemplates he will consider with judicial neutrality at the hearing on confirmation, viz., whether or not to confirm the plan. The various steps to be taken by Commission and Court throughout the formulation, the approval, the submission and the confirmation of the plan should be taken in orderly fashion in the exact sequence prescribed by Section 77 before any steps toward consummation are undertaken.

The reorganization managers will be vested with considerable discretion and considerable authority. It might well occur that the two managers to be designated by the Court, if designated now, might not be in life, or might otherwise be incapacitated to act, when consummation of the plan is undertaken. Their replacements might conceivably be dissatisfied with all the work preliminarily done, or even with the attorneys and other agents engaged to perform the work. The undersigned is, as counsel are well aware, not the first, and may not be the last, United States Judge called upon to act in this matter. Certainly the Judge who confirms the plan should name the managers to carry out the plan. I am convinced that he should do so at the time he confirms the plan and not at any earlier date.

The dissenting opinion of Circuit Judge Holmes, to the Court of Appeals affirmance of Judge Sibley's rejection of the Commission's Fourth Supplemental Report (Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d 538, at page 546) pinpoints the reasons for denying the present petition in apt and telling language. The majority opinion also disapproved of Judge Sibley's anticipatory holding that he would not confirm a plan overwhelmingly rejected by the creditors, but went into no detail. Judge Holmes said:

"The judge also concluded to disapprove the plan, even if it were lawful, because (he said) it was testified under oath before him and seemed plain to him that it would be rejected almost unanimously by the refunding bondholders. This ruling was premature, and was not warranted on the supposition that he would not later confirm the plan. Judicial discretion must be exercised at the time prescribed for the exercise thereof, and in the light of the facts existing at the appropriate date. No judge can foretell what his decision will be on a record that is not complete and that is to be made up of facts concealed in the womb of time. Such a decision *in futuro* would be uncertain even if it could be known that the same judge would preside at a subsequent hearing; but when it is impossible to foretell not only what the facts will be but who will be the presiding judge, the prediction is rendered doubly doubtful. This uncertainty as to the main element is extraordinary in the present case, because a member of the court of appeals was designated to hear it in the district court, and a district judge was designated to sit in the case on appeal to this court. When the same or an amended plan comes back from the Commission, a new judge may be presiding in the district court, and on appeal it may be heard before the court *en banc*. The circuit judge below said that ordinarily his conclusion would be premature but 'the atmosphere' of the trial and the 'feeling manifested' satisfied him absolutely that there would be no material change. In a matter of statutory procedure, where nice distinctions are drawn between the judicial functions of the court and the administrative powers of the Commission, it cannot be considered a waste of time to follow strictly the provision which provides that the plan, if approved, shall then be submitted by the Commission to the creditors of each class. There is no provision of law for the court or judge to submit the plan to the creditors or to give

any consideration before the vote is taken to how the creditors will vote on it. The best rule for any court, trial or appellate, is to decide the issues presented to it and to decide nothing more than is necessary to dispose of the case. *Dictum* should be avoided and forecasts discountenanced."

I share the desire of all concerned to expedite these proceedings in every way possible and proper. Yet I conclude that since this plan calls for the naming of two of the three reorganization managers by the Court, I am thus required to perform an important positive judicial act as a later step in these proceedings, and that present anticipation of that step by naming managers at this time, that is in advance of confirmation, should be refused.

Accordingly, it is

Ordered that the petition of St. Joe Paper Company and the testamentary trustees under the duPont trust with respect to the designation of reorganization managers (filed January 26, 1959) is denied.