# NORFOLK & WESTERN RAILROAD CO. *v.* NEMITZ ET AL.

No. 70–97.  Argued October 21, 1971—Decided November 15, 1971

*Martin M. Lucente* argued the cause for petitioner. With him on the briefs were *Howard J. Trienens* and *John M. Curphey.*

*Thomas J. Murray, Jr.,* argued the cause and filed a brief for respondents.

*Solicitor General Griswold, Fritz R. Kahn,* and *Leonard S. Goodman* filed a brief for the United States et al. as *amici curiae* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In connection with a 1964 consolidation by which petitioner railway company absorbed New York, Chicago & St. Louis R.. Co. (Nickel Plate), the so-called Sandusky Line, running from Columbus, Ohio, to Sandusky, Ohio, was acquired from the Pennsylvania Railroad system. Respondents were at the time employees of the Pennsylvania on the Sandusky Line. Their work was seasonal because the winter freeze barred navigation on Lake Erie. During those periods junior employees of Sandusky

worked at other points on the Pennsylvania's Toledo Division.

In anticipation of the 1964 consolidation, petitioner entered into an agreement with 19 labor organizations for protection of the employees of the several railroads coming into the consolidation, including those on the Sandusky Line. Petitioner agreed to employ "all employees of the lines involved *with the guarantee that they will not be adversely affected in their employment* as a result of the proposed transactions or for any reason other than furloughs due to seasonal requirements or a decline in volume of traffic or revenue. 324 I. C. C. 1, 89 (emphasis added).

Each employee was to receive a monthly supplement to his post-consolidation monthly earnings equal to the excess, if any, of his average monthly compensation for the 12 months prior to the consolidation in which he had performed services.

Some 96 Sandusky Line employees elected to accept employment with petitioner on the terms and conditions stated. Twenty-five were junior men who had worked seasonally on the Toledo Division and they were the plaintiffs in this action.

The consolidation took place and over a year elapsed during which these trainmen were not paid the compensation promised. Arbitration pursuant to the collective agreement was agreed upon. At that point in 1965 the union and petitioner entered into a new agreement which reduced substantially the benefits of the junior trainmen who had been Sandusky Line employees. The District Court (287 F. Supp. 221, 309 F. Supp. 575) held that this new agreement was not enforceable as a matter of law as it violated the Act under which the consolidation or merger took place. The Court of Appeals affirmed, 436 F. 2d 841, with a modification that the damages due

respondent-employees should be determined by the District Court, not through arbitration. The case is here on a petition for a writ of certiorari which we granted, 402 U. S. 994.

Section 5 (2)(f) [1] of the Interstate Commerce Act as amended, 54 Stat. 906, 49 U. S. C. § 5 (2)(f), provides that in mergers and consolidations "the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected" for a period of four years.

The ICC in its approval of the consolidation or merger (324 I. C. C. 1, 106 (1964)) stated that the agreements respecting, *inter alia,* the rights of the Sandusky Line employees were "made pursuant to and in conformity with section 5 (2)(f) of the Interstate Commerce Act for the protection of covered employees." [2]

----

[1] It provides:

"As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

[2] The Commission stated in its Report, 324 I. C. C. 1, 50:

"As previously stated herein and in appendix A, various agreements have been reached between employee representatives and

It construed the agreements as requiring "that job eliminations as a result of the proposed acquisition of control be accomplished only through normal attrition." *Ibid.*

The mandate of § 5 (2)(f) seems clear enough: the Commission "shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." The Commission, as noted, said that the conditions protective of the employees were made pursuant to and in conformity with the provisions of § 5 (2)(f) and it gave its authorization "subject to such agree-

the Norfolk & Western for the protection of employees adversely affected by these transactions. Our authorizations herein will, by reference, be made subject to such agreements. . . .

"We find that, as conditioned herein, the transactions under consideration meet the requirements prescribed by sections 5 (2) and 20a of the act and conform generally with the purposes and objectives of the national transportation policy declared by Congress. We are convinced that the transactions should be approved."

In the Appendix to its Report and Order, 324 I. C. C., at 89, the Commission continued:

"Norfolk & Western has entered into an agreement with 19 of the principal labor organizations, members of the Railway Labor Executives' Association, for the protection of employees of Norfolk & Western, Nickel Plate, and Wabash, as well as persons employed on the Sandusky Line of Pennsylvania, represented by these organizations. This agreement, which provides for the assumption by Norfolk & Western of all outstanding labor contracts, schedules and agreements of Nickel Plate and Wabash, as well as those having application on the Sandusky Line, basically requires that job eliminations as a result of the unification be accomplished only through normal attrition. Under its terms, Norfolk & Western agrees to take into its employment, upon consummation of the merger, lease, and purchase, all employees of the lines involved with the guarantee that they will not be adversely affected in their employment as a result of the proposed transactions or for any reason other than furloughs due to seasonal requirements or a decline in volume of traffic or revenue."

ments." 324 I. C. C., at 50. The Solicitor General and
the ICC argue in their *amicus curiae* brief that the last
sentence of § 5 (2)(f)—the "notwithstanding" provi-
sion—relieved the Commission of any duty to review the
adequacy of the protective provisions contained in a col-
lective-bargaining agreement, and that they were not
accorded protection by the ICC order.[3]

We disagree with that view. We reviewed the history
of § 5 (2)(f) in *Railway Executives' Assn.* v. *United
States,* 339 U. S. 142, and said that "one of its principal
purposes was to provide mandatory protection for the
interests of employees affected by railroad consolida-
tions."[4] *Id.,* at 148. That "mandatory protection" can
be accorded by terms provided by the Commission, or, as
is more likely, by provisions of a collective agreement
which the Commission adopts or approves as adequate
for a minimum of four years (as required by the second
sentence) or longer (as allowed by the first sentence)
if the Commission so provides. *Id.,* at 154. The pur-
pose of § 5 (2)(f) was not to freeze jobs but to provide
compensatory conditions. *Brotherhood of Maintenance
of Way Employes* v. *United States,* 366 U. S. 169,
175–176. In that case we noted that the Commission
has consistently followed that practice "in over 80 cases,
with the full support of the intervening brotherhoods."
*Id.,* at 177. And the Commission over and over again has
adopted the set of labor conditions contained in collective
agreements in discharge of its duty under § 5 (2)(f).
See *Gulf, M. & O. R. Co. Purchase,* 261 I. C. C. 405, 434;
*Erie R. Co. Trackage Rights,* 295 I. C. C. 303, 305;

---

[3] The result, of course, would be that there would be no basis for
judicial review of the ICC order pursuant to 28 U. S. C. § 1336.

[4] A synopsis of the legislative history of § 5 (2)(f) is contained
in an Appendix to our opinion in *St. Joe Paper Co.* v. *Atlantic
Coast Line R. Co.,* 347 U. S. 298, 315.

*Delaware, L. & W. R. Co. Trackage Rights,* 295 I. C. C. 743, 755–756.

When there is a collective agreement and the Commission, as here, adopts or approves it, the "notwithstanding" sentence of § 5 (2)(f) is not, as suggested, read out of the Act. The collective agreement then becomes a "condition" of the Commission's "approval" of the consolidation under the first sentence of § 5 (2)(f) and its provisions are deemed by the Commission to be "a fair and equitable arrangement to protect the interests" of the employees within the meaning of the first sentence. Thus, the significance of the "notwithstanding" proviso is that it provides the machinery for the terms of a pre-merger collective agreement and thus supplies the minimum measure of fairness required under the first sentence of § 5 (2)(f).

In 1965 an implementing agreement, entered into after the consolidation, was made between the union and petitioner. It is petitioner's claim that it limited these junior employees to their average monthly earnings on the Sandusky Line during the 12 months before the consolidation, regardless of how many months the employees had worked during that period on other sections of the Toledo Division. That is to say, each of them would receive under the 1965 implementing agreement an average monthly compensation based only on their seasonal Sandusky Line work. Thus, respondent Nemitz had an average monthly compensation of $583.34 representing pre-consolidation work on several sections of the Toledo Division. Under the § 5 (2)(f) agreement governing the consolidation, his earnings would be supplemented to the extent that his post-consolidation monthly earnings fell short of $583.34. Under the 1965 agreement his average monthly compensation, based solely on his work on the Sandusky Line, would be $194.40. Even

this amount would not be paid if, as likely, he received that much in unemployment compensation. The 1965 agreement obviously placed these junior employees "in a worse position with respect to compensation," as those words are used in the pre-consolidation agreement. For they no longer could work on any part of the former Toledo Division except the Sandusky Line and their prior compensation, reflecting in part work on other parts of the Toledo Division, was no longer a measure of the "compensation" to which they were entitled under the pre-consolidation agreement. For those whose historical average monthly earnings were so slight that they were now on unemployment insurance, the result would be much more drastic than "normal attrition," which the Commission said was the only way under the protective conditions by which jobs would be eliminated. The Court of Appeals said:

> "An agreement made pursuant to the last sentence of Sec. 5 (2)(f) may vary the protections afforded by the I. C. C. order, but it may not substantially abrogate employees' rights grounded in an I. C. C. order." 436 F. 2d, at 848.

We agree with that view. We also agree that the 1965 implementing agreement [5] abrogated the standard

---

[5] The agreement authorized by the Commission when the merger was approved was described as follows by the Commisson, Appendix to Report and Order of Interstate Commerce Commission, 324 I. C. C., at 89:

"The agreement also authorized Norfolk & Western to transfer the work of employees throughout the merged system and requires the labor organizations to enter into implementing agreements permitting employees either to follow their work or be assigned to other jobs within their craft or class within the same general locality as existing jobs, following a period of retraining, if necessary, at Norfolk & Western's expense."

of "compensation" covered by the pre-consolidation agreement [6] which had come under the protective order of the Commission.

The judgment below is therefore

*Affirmed.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE WHITE join, dissenting.

I am sympathetic with the respondents and with the unfortunate predicament in which, largely by their own acts, they find themselves. I feel, however, that the Court's decision to the effect that federal district court jurisdiction exists here and that the judgment of the Court of Appeals is to be affirmed amounts only to a sympathetically imposed judicial cure that is not authorized by the Interstate Commerce Act, that is violative of Congress' intent, and that ignores unusually clear legislative history.

In January 1962 the Norfolk & Western and the respondents' own Brotherhood, and others, entered into an agreement for the protection of employees in the event of approval of the anticipated merger. This agreement, by the express terms of its paragraph VIII, was directed to "the last sentence of Section 5 (2)(f) of the Interstate Commerce Act." In October 1965 the railroad and the union, and others, entered into an Implementing Agreement. It then follows, it seems to me, that a number of factors demand a result opposite to that reached by the Court:

1. *The very language of the statute.* Section 5 (2)(f) was added to the Interstate Commerce Act by the

---

[6] The union that negotiated the Implementing Agreement disagreed with that position as did the union's National Board of Appeals. Both, however, proceeded on a mistaken view of the law.

Transportation Act of 1940, 54 Stat. 906. It is the Act's only provision relating to employee benefits. The thrust of the subsection's third and last sentence, beginning with the exclusionary word "notwithstanding," is crucial here.

The first sentence directs the Interstate Commerce Commission, as a condition of its approval of any railroad merger, to "require a fair and equitable arrangement to protect the interests of the railroad employees affected." The second sentence states that in its order of approval the Commission shall include provisions protective for a four-year period. The third sentence then reads:

> "Notwithstanding any other provisions of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

This plain and unambiguous "notwithstanding" language, obviously and necessarily directed to and affecting only the two preceding sentences, requires that an agreement entered into by the carrier and the collective-bargaining representative be controlling. The two preceding sentences have application, therefore, only when an agreement "pertaining to the protection of the interests of said employees" is *not* executed. In the case before us the carrier and the Brotherhood did execute an agreement of the kind specified, and the "notwithstanding" language should come into play. The Court today nullifies that sentence and reads it out of the Act.

2. *The legislative history.* This history is clearly antagonistic to respondents' position here. The Transportation Act of 1940 was no accident or floor-conceived legislation. Indeed, Senator Wheeler was led to "venture

the assertion that the bill was given more careful and more thoughtful consideration than any other bill which has ever come before the Senate in my time." 86 Cong. Rec. 11270. It emerged from the economically distressed days of the 1930's, from the Washington Job Protection Agreement of 1936 (see Hearings on H. R. 2531 before the House Committee on Interstate and Foreign Commerce, 76th Cong., 1st Sess., vol. 1, p. 231), and from recommendations of President F. D. Roosevelt's Committee of Six (see Hearings, *supra,* at 259).

What is now § 5 (2)(f) was not contained in the original House version (H. R. 4862, 76th Cong., 1st Sess.), or in the original Senate version (S. 2009, 76th Cong., 1st Sess.), or, indeed, in the draft contained in the initial H. R. Conf. Rep. No. 2016 of April 26, 1940, 76th Cong., 3d Sess. It surfaced as § 7 of the revised draft submitted with the supplanting H. R. Conf. Rep. No. 2832 of August 7, 1940, 76th Cong., 3d Sess. The new language replaced the earlier Harrington Amendment to the House version. The reasons for the change effected by the conferees are set forth on pages 68–69 of H. R. Conf. Rep. No. 2832. Although the comments there do not focus on the "notwithstanding" sentence, its purpose and significance are apparent from the debates.

Representative Harrington had succeeded in amending the House bill to include a directive that the Commission approve no transaction resulting in unemployment or displacement of employees. 84 Cong. Rec. 9882, 9886, 10127. The conference committee, however, eliminated all employee-protection provisions. When the bill again reached the House floor, Mr. Wadsworth proposed the recommitment of the bill with instructions, among others, to include merger provisions and the "notwithstanding" sentence, drafted by the railroad unions themselves. 86 Cong. Rec. 5886. As to that sentence,

48

Congressman Harrington, an advocate of compulsory employee protection, had said:

> "But this provision also contains a clause that permits the industry, through the processes of collective bargaining, to work out its problems in a democratic manner." 86 Cong. Rec. 5871.

The motion to recommit passed. The conference committee in due course then reported § 5 (2)(f) in its present form. Congressman Wolverton, a conferee, spoke in support of the revised bill:

> "And, then there was also further uncertainty in the opinion of some representatives of railroad labor as to whether the language of the amendment might not preclude voluntary agreements, between management and men by collective bargaining, from being entered into.
>
> "I want, however, to make it clear that no one who expressed the opinions I have mentioned thought for a moment that any of these possibilities were ever intended by the sponsors of the amendment." 86 Cong. Rec. 10189.

And Congressman Lea referred to the "notwithstanding" sentence as "a provision confirming the right of employees to enter into agreements with railroads to take care of them in case of unemployment as a result of consolidations." 86 Cong. Rec. 10178.

For me, all this evinces a clear and positive intent on the part of the authors of this legislation to make appropriate provision for employee protection, but explicitly to withdraw Commission-dictated protection whenever the carrier and the union, before merger, voluntarily arrive at protective provisions satisfactory to them. This was the purpose of the "notwithstanding" clause. Furthermore, it is in accord with the "strong federal labor policy against governmental interference with the sub-

stantive terms of collective-bargaining agreements." *Chicago & North Western R. Co.* v. *United Transportation Union,* 402 U. S. 570, 579 n. 11 (1971). In my view, the Court's decision today, and the decisions of the District Court and the Court of Appeals, overlook or choose to ignore this purpose and this legislative history. Instead, a result is achieved that is the exact opposite of the congressional intent and policy.

Respondents urge that this Court in the past has recognized the Commission's responsibility to review the sufficiency of third-sentence voluntary agreements and to "adopt" them as part of its orders, citing *Railway Executives' Assn.* v. *United States,* 339 U. S. 142 (1950), and *Brotherhood of Maintenance of Way Employes* v. *United States,* 366 U. S. 169 (1961). These are the only two decisions the Court produces to support its theory of jurisdiction. Neither is apposite. The former case presented the question whether under sentence two the Commission had the power to prescribe protective provisions extending beyond the four-year period to which that sentence refers. The holding was in the affirmative. The Court now makes much of the language of "mandatory protection" in that decision. But no pre-merger voluntary agreement had been made there, and the effect of sentence three did not enter the case. Nor had a premerger agreement been reached in the latter *Maintenance of Way* case, where the issue was whether, when the Commission formulates its own protective provisions under sentence two, it must require the carrier to retain employees for the four-year period or simply to guarantee them equivalent compensation. The disagreement between the parties there arose at the Commission hearing on what protective arrangements should be imposed by the Commission in fulfillment of its sentence two duty.

The Commission seems consistently to have taken a position in line with the legislative history noted above,

and with the clear meaning of the "notwithstanding" sentence. See, *e. g., Great Northern Pacific & Burlington Lines-Merger-Great Northern R. Co.,* 331 I. C. C. 228, 278 (1967); *Pennsylvania R. Co.-Merger-New York Central R. Co.,* 327 I. C. C. 475, 544 (1966); *Norfolk & Western R. Co. and New York, Chicago & St. Louis R. Co.-Merger,* 324 I. C. C. 1, 9, 90 (1964); *Missouri Pacific R. Corp. in Nebraska Trustee Operation,* 247 I. C. C. 653, 657 (1941).

Neither respondents nor the Court points to a single instance in which a pre-merger voluntary protective agreement directed at § 5 (2) (f) was either reviewed and found wanting by the Commission, or was "included" in the Commission's order in any sense except that recognition of the existence of such an order is necessary for the Commission to relieve itself of the duty that would otherwise be imposed on it by sentence two.*

3. *The effect on collective bargaining.* The result reached by the Court appears to me to require the ICC and the courts always to intrude upon collective bargaining, by reviewing the sufficiency of its substantive product, and thereby to discourage and to downgrade the collective-bargaining process that has been so firmly established in this area and so steadfastly protected. See, for example, *International Association of Machinists* v. *Street,* 367 U. S. 740 (1961). As this case makes only too clear, the general standard of sentence two of § 5 (2) (f), namely, "a worse position with respect to their employment," permits of widely varying interpretations when applied to specific dilemmas such as that of the

---

*Respondents refer to *Florida East Coast R. Co. Reorganization,* 307 I. C. C. 5 (1958), aff'd, 312 I. C. C. 744, aff'd, 171 F. Supp. 512 (SD Fla. 1959), but the District Court's decision in that case plainly sustained the Commission's determination that because a bankruptcy reorganization was involved, no part of § 5 (2) (f) was applicable.

respondents here. The Court's holding implies for me that any agreement between the carrier and the Brotherhood pursuant to sentence three of § 5 (2)(f), however protective, is nevertheless not to be regarded as controlling if it is subsequently deemed less protective than Commissioners or judges think it should have been. Neither the language nor the legislative history warrants our espousing such judicial overview.

4. *The facts and the element of choice.* Contrary to the impression one might receive from a quick appraisal of either the opinions below or that of the Court here, it is not at all clear that the Implementing Agreement took from respondents something they had a reasonable expectation of receiving when the merger was approved. On its face, the application to respondents of the 1962 agreement, the language of which ("placed in a worse position with respect to compensation") reflected the generality of § 5 (2)(f), is ambiguous. Interpretation of this language necessarily requires an understanding of the parties' original intentions with respect to Sandusky Line employees. Respondents were not without a substantial measure of selection of their future work at the time of the transfer of the Sandusky Line. That choice was between continued employment with the Pennsylvania, with seniority on its Toledo division maintained, or abandoning a part of their working territory and casting their lot with Norfolk & Western as acquirer of the Sandusky Line. Had they chosen to stay with the Pennsylvania, as it appears the parties to the agreement expected they would, respondents would not have brought on their present plight. For personal reasons such as, perhaps, residence in Sandusky (a factor of less than ideal convenience in the off-season regardless of the choice they made), they chose the other course and incurred the risks both of new employment and of the application of the protective provisions to them

under the unexpected circumstances. This situation highlights the wisdom of the policy of § 5 (2)(f), namely, to leave the solution of their problem to their own Brotherhood (their bargaining representative with the Norfolk & Western as well as with the Pennsylvania), rather than to the benevolent hindsight of the Commission or of a court.

All this propels me to the conclusion that the Commission may not be held to have reviewed and incorporated the 1962 agreement into its 1964 order authorizing the merger. All it did was to state that its duty to see to the protection of employees under § 5 (2)(f) was satisfied by the execution of the 1962 agreement. It follows that there was no district court jurisdiction and that the respondents' complaint should have been dismissed.