Carl **FLAHERTY** et al., Plaintiffs,

v.

**KANSAS, OKLAHOMA AND GULF RAILROAD COMPANY**, Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Order of Railway Conductors and Brakemen and Brotherhood of Railroad Trainmen, Defendants.

Civ. No. 5514.

United States District Court
E. D. Oklahoma.

March 24, 1966.

Ungerman, Grabel, Ungerman & Leiter, Tulsa, Okl., for plaintiffs.

Mark M. Hennelly and Robert W. Yost, St. Louis, Mo., Chal Wheeler, Muskogee, Okl., Dyer, Powers, Gotcher & Marsh, Tulsa, Okl., for defendants.

DAUGHERTY, District Judge.

This matter has been submitted to the Court on an agreed stipulation of facts, an evidentiary hearing, arguments and briefs presented by both sides.

The Plaintiffs are employees of the Defendant, Kansas, Oklahoma and Gulf Railroad Company and are members of certain of the Unions named as defendants herein.

In this matter the Plaintiffs seek to enforce an order of the Interstate Commerce Commission under the authority of Title 28, U.S.C., Section 1336 by obtaining a judgment of the Court that a cer-

tain Memorandum of Agreement dated May 4, 1963, and effective May 3, 1963, entered into between the Defendant, Railroad Company, and the Defendant Unions, is in derogation of said I.C.C. order and is null, void, illegal and unenforceable. Plaintiffs also requested judgment for certain individual losses of wages, but at the pretrial conference herein the Plaintiffs acknowledged that this element of requested relief is inappropriate in this case and accordingly may be considered as being withdrawn.

Under date of December 27, 1962, the Interstate Commerce Commission entered a Certificate and Order permitting the Defendant Railroad Company, to abandon a portion of its railroad line. As a part of the Certificate and Order the Interstate Commerce Commission, for the protection of employees of the Defendant Railroad who might be adversely affected by the abandonment, included therein certain conditions known as the Burlington Conditions. In brief, these Burlington Conditions provide for benefits for a four year protective period in case an affected employee is (1) placed in a worse position with respect to his compensation and rules governing his work conditions, and (2) twelve months pay if any such affected employee is deprived of employment, and (3) a continuance of certain pension, hospital, transportation benefits, etc., and (4) certain relocation benefits upon a requirement to change a point of employment. The Burlington Conditions in Section 5 thereof also provide that in the event any dispute or controversy arises with respect to the foregoing four protective conditions which cannot be settled by the Railroad and an employee, or his authorized representative, the same may be referred to an arbitration committee for consideration and determination.

Prior to the entry of the aforementioned Interstate Commerce Commission Certificate and Order, the affected employees, through their respective Unions, and the Railroad Company, stipulated and agreed that the aforementioned Burlington Conditions could, or should be, adopted by the Interstate Commerce Commission as the method of protecting the interests of the affected employees.

After the entry of the aforementioned Certificate and Order of the Interstate Commerce Commission, it appears that a dispute, or disputes, arose with reference to wage claims made by certain employees of the Defendant Railroad Company, regarding portions of the abandoned line which had been sold to and was being operated by other railroad companies. As a result, certain conferences were held between the Railroad and Unions and eventually the aforementioned Memorandum of Agreement dated May 4, 1963, was entered into.[1] In brief,

1. The Memorandum of Agreement reads as follows:

Effective May 3, 1963, for and in consideration of the Kansas, Oklahoma & Gulf Railway Company agreeing to make payment of Seven Hundred ($700.00) Dollars to each employee in both train and engine service who were on regular assigned jobs or the extra board during the twelve month period immediately preceding December 27, 1962, such being 29 engine service employees and 45 train service employees, represented by the following Organizations; Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Order of Railway Conductors and Brakemen and Brotherhood of Railroad Trainmen.

It is understood and agreed that by the payment set forth herein all employee benefits prescribed in I.C.C. Dockets 22169 and 22198 described therein and identified as the Burlington Conditions, are satisfied.

It is understood that each individual employee affected will be paid the amount specified herein and upon payment will sign a receipt releasing the Carrier of all obligations and conditions set forth under the Burlington Conditions.

It is understood that this Agreement cancels all existing Agreements and Understandings concerning operation of the abandoned line Baxter Springs, Kansas to Okay, Oklahoma, and all outstanding claims of record to that portion of the Carrier's abandoned line between Baxter Springs, Kansas and Okay, Oklahoma are cancelled.

It is understood when service is no longer required to the Damsite there will

this Memorandum of Agreement provides that each employee of the Defendant Railroad affected by the abandonment, in lieu of said wage claims and the protective benefits afforded by the Burlington Conditions, would receive the stipulated sum of $700.00. Seventy-four employees were so affected. Seventy-four checks were issued, sixty-eight of which have been endorsed and cashed. Each check contained a provision that by endorsing and cashing the same the employee released the Defendant Railroad Company, of and from any and all of its obligations under the Burlington Conditions.

Plaintiffs assert herein that said Memorandum of Agreement is illegal and unenforceable for the reasons that there is no specific statutory authority for the same; that it is not authorized by the said Interstate Commerce Commission Certificate and Order; that the same changed the protective benefits of said Certificate and Order and is in derogation thereof; that the same is discriminatory against certain employees and that the signatory Unions exceeded their authority and violated certain provisions of their authority and violated certain provisions of their constitutions, by-laws and rules and regulations in entering into said Memorandum of Agreement.

The defendants by way of defense, assert that Plaintiffs' complaint is not an attempt to enforce an Interstate Com-

---

be no protest or claims when the line is removed from the Damsite to Okay.

It is further understood and agreed:

1. A local freight run will be established to operate daily in assigned turn-around service from Muskogee and/or AB/BC Jct. to the Kerr Damsite located in the vicinity of Mile Post 87, or to any point short thereof as necessary.

2. It is also agreed this assigned local freight run will continue to operate daily until the Kansas, Oklahoma & Gulf Railway's interchange operations at Okay and Wagoner are discontinued as a result of the restoration of joint through train operation into Muskogee, Oklahoma. It is further understood and agreed that Items 1 and 2 of this agreement terminate on the date this joint through train operation is effected, and thereafter such service as may be required to the Damsite will be operated as unassigned or extra service.

3. A maximum of one arbitrary hour will be allowed for picking up at Okay and/or Wagoner, and a maximum of one arbitrary hour will be allowed for setting out at Okay and/or Wagoner. In no event will the crew make more than a total of one hour for picking up and one hour for setting out on any one trip. Trains and crews may be run to and from AB/BC Jct. or Muskogee yard.

4. It is agreed the engine may be operated with the short or long end ahead on this particular job, however, it is understood this is not to be construed as superseding any other agreement rule. Cars may be shoved ahead of the engine from Locust Grove to the Damsite.

This Agreement will be considered a separate agreement on behalf of the parties signatory hereto and the Kansas, Oklahoma & Gulf Railway Company.

BROTHERHOOD OF LOCOMOTIVE ENGINEERS
/s/ H. L. Wade
H. L. Wade, General Chairman.
/s/ D. C. Owens
Approved: D. C. Owens, Assistant Grand Chief Engineer.

BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN
/s/ J. A. Sublett
J. A. Sublett, General Chairman.
/s/ Dan C. Owens
Approved: D. C. Owens, Asst. Grand Chief Engr.—Representing.

ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN
/s/ F. L. Hudson
F. L. Hudson, General Chairman.
/s/ O. R. Lundborg
Approved: O. R. Lundborg, Vice President.

BROTHERHOOD OF RAILROAD TRAINMEN
/s/ E. L. Campbell
E. L. Campbell, General Chairman.
/s/ Roy D. Heape
Approved: R. D. Heape, Vice President.

KANSAS, OKLAHOMA & GULF RAILWAY COMPANY
/s/ W. A. Carpenter
W. A. Carpenter, Vice President-Personnel.
/s/ W. L. Bibb
W. L. Bibb, Asst. Supt. Transportation.

merce Commission Order under Title 28, U.S.C., Section 1336 since the said Memorandum of Agreement supersedes the Burlington Conditions contained in said Certificate and Order and jurisdiction of Plaintiffs' complaint is therefore governed by said Memorandum of Agreement and not the Interstate Commerce Commission Order citing Arnold v. Louisville and Nashville Railroad Company, 180 F. Supp. 429, affirmed Batts v. Louisville & Nashville R. Co., 316 F.2d 22.[2] The defendants also assert that this litigation is premature in that the plaintiffs have failed to arbitrate the alleged differences in accordance with the provisions of the Burlington Conditions (Section 5)[3] and also pertinent provisions of the Railway Labor Act require the carriers and employees to settle all disputes by agreements to avoid an interruption to commerce.[4] Further, by way of defense the defendants assert that the said Memorandum of Agreement is legally binding on plaintiffs and enforceable under authority contained in Section 5 of the Burlington Conditions, of provisions of Section 2 of the Railway Labor Act, 45 U.S.C. § 152,[4] and Section 5(2) (f) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (f),[5] and is further authorized by rules

2. In Arnold v. Louisville and Nashville Railroad Company, 180 F.Supp. 429 (D.C. Tenn.1960), affirmed Bates v. Louisville & Nashville R. Co., 316 F.2d 22 (6th Cir. 1963), lines were merged with I. C. C. permission. The I. C. C. made provisions for the protection of employees adversely affected by the merger and thereafter the employees through their bargaining representatives and the Railroad entered into an agreement making provisions for their own protection. The statute on merger required the I. C. C. to impose protective provisions but reserved the right of employees and the railroad to Contract for the protection of affected employees. In the litigation that followed the Court held the contract to be valid, that the same superceded the earlier I. C. C. protective provisions and that the litigation was therefore founded on the contract and not the enforcement of the I. C. C. order under 28 U.S.C. §§ 1336 and 1337. While there is no specific statutory approval of such a contract in the abandonment statute as in the merger statute, there is no ban against such action in the abandonment statute nor does such statute in the first place require the I. C. C. to impose protective provisions in the case of an abandonment.

3. 5. In the event that any dispute or controversy arises with respect to the protection afforded by the foregoing conditions Nos. 1, 2, 3, and 4, which cannot be settled by the carrier and the employee, or his authorized representatives, within 30 days after the controversy arises, it may be referred, by either party, to an arbitration committee for consideration and determination, the formation of which committee, its duties, procedure, expenses, et cetera, shall be agreed upon by the carrier and the employee, or his duly authorized representatives.

4. Title 45, United States Code, Section 152 (Railway Labor Act) provides as follows: "General duties—First. Duty of carriers and employees to settle disputes. It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
"Second. Consideration of disputes by representatives. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers, and by the employees thereof interested in the dispute."

5. Title 49, United States Code, Section 5(2) (f) reads as follows:
"As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad af-

of the defendant Unions.[6] The defendants further point out that there is no prohibition found in any of the pertinent laws against such Memorandum of Agreement being entered into between the Railroad and Unions. The defendants also assert that this action cannot lie not only because jurisdiction does not exist under 28 U.S.C. § 1336 but also because a diversity of citizenship does not exist and the requisite jursdictional amount is not involved. Finally, defendants, as an affirmative defense, claim that the plaintiffs, or at least all but six of them, have released the defendant Railroad Company, of any obligations under the Burlington Conditions and have ratified the May 4, 1963, Memorandum of Agreement by endorsing and cashing their respective checks, all of which estops the plaintiffs from laying claim to benefits under the superseded Burlington Conditions. Whereas the defendants dispute jurisdiction of the Court under 28 U.S.C. § 1336, they concede jurisdiction in their briefs under 28 U.S.C. § 1337 to determine the validity of the May 4, 1963, Memorandum of Agreement.

Thus, as the issues have been drawn, the primary and paramount decision to be made by the Court has to do with whether or not the said Memorandum of Agreement dated May 4, 1963, is legal and enforceable. If it is not, as claimed by plaintiffs, the Court should so hold and enforce the Interstate Commerce Commission Certificate and Order by ridding it of said Memorandum of Agreement as an obstacle to its enforcement and so used by the defendants. On the other hand, if said Memorandum of Agreement is a legal and enforceable agreement, the Court should so hold and the complaint should be dismissed for failure to assert grounds upon which relief may be granted by this Court.

■  The Court is of the opinion and finds that said Memorandum of Agreement is a legal and enforceable contract between the Railroad and the Unions and is binding upon the plaintiffs as members of the signatory Brotherhoods. This conclusion is reached by reason of the provisions of the Railway Labor Act, 45 U.S.C. § 152, and Sec. 5(2) (f) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (f), and Sec. 5 of the Burlington Conditions, supra.

■■  The aforementioned provision of the Railway Labor Act and the spirit of that legislation definitely encourages and calls for the negotiation and collective bargaining of this type of dispute. Title 49 U.S.C. § 5(2) (f), being a part of the Chapter governing both abandonment of lines and mergers of lines, appears to authorize and approve negotiations and collective bargaining regarding a dispute of this nature. It is observed by the Court that the subject matter of this controversy involves protective benefits to affected employees and does not affect the general public regarding the operation of railroad lines. It is therefore deemed to be a type of benefit to be properly the subject of a negotiated contract between affected employees through their Unions and a Railroad Company. Also the Court finds no ban or prohibition against this type of an agreement in the pertinent laws and none has been brought to the attention of the Court. In this connection it appears that Congress in the case of a merger of lines specifically requires the I.C.C. to establish protective provisions for affected employees but also specifically provides that

---

fected by such order being in a worse position with respect to their employment, except that the protection afforded to any employees pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwith-

standing any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

6.  See Footnotes 8 and 9, infra.

the Railroad and affected employees through their Unions have the reserved right to enter into an agreement as to such terms, conditions and arrangements for their own protection. 49 U.S.C. § 5(2) and 49 U.S.C. § 5(2) (f). However, in the case of an abandonment of a line or part thereof, Congress has not required the I.C.C. to establish protective provisions for affected employees and, of course, is then silent on the subject of the right of the railroad and employees to enter into an agreement as to terms, conditions and arrangements for their own protection. 49 U.S.C. § 1(18), (19) and (20).[7] The Courts have held that it is discretionary with the I.C.C. as to whether it desires in an abandonment to impose protection provisions for affected employees. Brotherhood of Locomotive Engineers v. United States, D.C., 217 F. Supp. 98.

Moreover, Section 5 of the Burlington Conditions clearly contemplates the possibility of a dispute regarding these protective benefits and recognizes that same may be settled by an agreement between the railroad company and the affected employees through their bargaining representatives, and if not so settled within a specified period of time, may then be submitted to arbitration. The basic abandonment law and the I.C.C. Certifi-

cate and Order thus both invite the Railroad and Unions to negotiate and settle disputes by agreements. In this case a dispute arose regarding the abandonment ordered and the Burlington Conditions. Certain employees had filed wage claims based on the abandoned line. The railroad refuted these claims by the Burlington Conditions. This dispute and the Burlington Conditions were settled by the Memorandum of Agreement dated May 4, 1963.

Thus the Court finds and concludes that the Memorandum of Agreement should be and is a valid and enforceable agreement and binding on the plaintiffs, if legally and properly entered into by the signatory Unions as representatives of the plaintiffs.

Regarding the contention of the plaintiffs that their Unions did not follow required procedures in entering into such Memorandum of Agreement, it appears that these complaints are: (1) The approval or disapproval of the Memorandum of Agreement was not submitted to the local Lodge for a vote of the local members, (2) the Memorandum of Agreement is discriminatory, and, (3) the National Brotherhoods had no authority to execute the Agreement and bind the local members. The defendants respond by asserting that (1) a local vote is not neces-

7. Abandonment is covered by 49 U.S.C. § 1(18), (19) and (20) which in part reads as follows:

Section 1, (18). "EXTENSION OR ABANDONMENT OF LINES; CERTIFICATE REQUIRED; CONTRACTS FOR JOINT USE OF SPURS, SWITCHES, etc. * * * and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

Section 1, (19). "APPLICATION FOR CERTIFICATE OF COMMISSION; NOTICE AND HEARING. The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this chapter shall apply to all such proceedings." * * *

Section 1, (20). "ISSUANCE OF CERTIFICATE BY COMMISSION; UNLAWFUL EXTENSION OR ABANDONMENT OF LINES. The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require." * * *

sary or required, (2) the Agreement is not discriminatory, and, (3) the National Brotherhoods are authorized to execute this type of agreement and when so executed the same is binding in effect on the members of the local Lodge.

■ Upon consideration of these points with the aid of briefs and arguments from both sides, the Court finds that a local vote or approval or disapproval is not required in connection with the execution of the said Memorandum of Agreement. A local vote is required in certain instances, but the subject matter of this Agreement does not fall within such instances. The Court further finds that whereas some employees may get less and some employees may get more than they would have received under the Burlington Conditions if they had not been given up by the said Memorandum of Agreement, the Court is of the opinion that there is not presented here such unwarranted or hostile discrimination as would render the agreement invalid. Many considerations were involved. The Court believes that the National Brotherhoods had the best interests of the local

members in mind when they agreed to the terms of said agreement, executed the same in good faith, and honestly felt that it was the best solution for all affected members. McMullans v. Kansas O. & G. Ry. Co. (10 Cir. 1956) 229 F.2d 50. The Court further finds that the plaintiffs were members of only two of the signatory Unions, namely, the Brotherhood of Locomotive Firemen and Enginemen, and the Brotherhood of Railroad Trainmen. In both of these Brotherhoods authority existed for their execution of the said Memorandum of Agreement involved herein. This is found in paragraph (b) of Section 16, Article 9, of the Constitution of the Brotherhood of Locomotive Firemen and Enginemen.[8] And such authority is found in Section 14 of the Protective Department General Rules of the Brotherhood of Railroad Trainmen.[9] That such authority exists is supported by the rejection within a Union of an appeal that certain members took in contesting the signing of said agreement. The Court further finds that the local Lodges in each Brotherhood called on the National Brotherhood to

---

8. This paragraph reads as follows:
(b) "Every member by becoming such shall be deemed to have authorized the Brotherhood and its duly constituted committees and officers to act as his agent or representative in the handling of all claims, grievances, complaints and disputes which have arisen or may arise under an agreement negotiated with a railroad or other employer and pursuant to such authorization in their discretion to present, settle, adjust or compromise the same in or before any court or other tribunal, or by other procedures including those provided by the Railway Labor Act, and to have waived throughout all right to notice and appearance provided by statute or otherwise, unless a member, in individual cases, gives to the Brotherhood reasonable written notice to the contrary."

9. This paragraph reads as follows:
"No. 14. Except in individual cases where the member or members involved serve reasonable written notice on the Brotherhood to the contrary, each member of the Brotherhood of Railroad Trainmen grants full and complete authority to the said Brotherhood and any and all of its

duly constituted representatives to act for him and in his name for the purpose of collecting, settling, compromising, amending, dismissing, or in any other manner disposing of any and all of his claims, complaints or grievances against his railroad and motor carrier employers, and authorizes the Brotherhood and its representatives to submit such claims, complaints or grievances for determination to any person, board or other tribunal provided by law or otherwise which to the Brotherhood or its representatives may be deemed necessary or advisable, and the Brotherhood and its representatives shall have full and complete authority to receive notice of hearings, if any, or to waive hearing, and to appear for, represent and act for its members before such person, board or other tribunal in connection with the consideration and determination of such claims, complaints or grievances; provided, that any adverse action by the Brotherhood or its representatives on any such claim, complaint or grievance shall be subject to the appropriate right of appeal under the terms and limitations of this constitution."

confer and negotiate with the Railroad regarding said dispute and that all local members are members of the National Brotherhood and that no plaintiff gave written notice to his Brotherhood refuting this authority to negotiate and settle his claim, dispute or grievance.

The Court therefore finds and concludes that the signatory Unions were authorized to execute said Memorandum of Agreement, and followed all prescribed procedures and requirements in executing the same, and that said agreement is binding on all of the plaintiffs.

Accordingly, the Court finding said Memorandum of Agreement to be legal, enforceable and binding on plaintiffs and to have been properly and legally entered into by the signatory Unions on behalf of the plaintiff employees, the complaint of plaintiffs must be dismissed. Counsel for defendants will prepare an appropriate judgment based on the foregoing and present the same to the Court for execution and filing herein.