**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**J. TAYLOR MART, INC., d/b/a Taylor's I. G. A. Foodliner, Respondent.**

**No. 16911.**

United States Court of Appeals
Seventh Circuit.

Feb. 13, 1969.

Arnold Ordman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Thomas Silfen, Lawrence M. Joseph, Attys., N. L. R. B., Washington, D. C., for petitioner.

Arthur R. Donovan, Joseph A. Yocum, Harry P. Dees, Evansville, Ind., for respondent; Kahn, Dees, Donovan & Kahn, Evansville, Ind., of counsel.

Before DUFFY, Senior Circuit Judge, and SWYGERT and CUMMINGS, Circuit Judges.

DUFFY, Senior Circuit Judge.

This is a petition by the Labor Board for enforcement of an order issued against the respondent (Company). The Board's decision and order are reported at 166 N.L.R.B. No. 73.

The Board found the Company discharged employee Margaret Hinderliter in violation of Section 8(a) (3) and (1) of the Act. Also, that the Company violated Section 8(a) (1) of the Act by coercively interrogating its employees. The Board further found the Company violated Section 8(a) (1) of the Act by raising wages in order to discourage union membership, and also that the Company violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the Union.

In May 1966, the Union[1] commenced an organizing campaign among the employees at the Company's Mattoon, Illinois, store. Two employees, Margaret Hinderliter and Marie Fonner, conducted an in-plant card-signing drive for the Union. By May 26th, the date when Hinderliter was discharged, thirteen of the forty employees of the store had signed union authorization cards. Six of these cards were solicited and collected by Hinderliter, all on Company premises.

On May 23rd, Charles Morrical, a Company supervisor, approached Virginia Frye, an employee in the bakery department, and inquired whether Margaret Hinderliter had spoken to her about the Union. Frye replied that Hinderliter had discussed the Union, but "no more than any other employee." At that time, Frye had already signed a union authorization card at the request of Marie Fonner.

On May 26th, Hinderliter had observed her immediate supervisor, Ralph Sherman, in conversation with the store manager, Hubbartt. She asked Sherman whether she was to be discharged, and Sherman advised her in the affirmative, and told her to see Hubbartt for further details. She then questioned Hubbartt in his office and he said that the Company no longer needed a cake decorator. Although Hinderliter had done most of the Company's cake decorating, it only required two to four hours of her eight-hour day. She had not been employed for any specific purpose, and most of her time had been spent in the normal activities of a bakery department employee.

When Hinderliter pointed out to Hubbartt her usual duties and that there were employees with less seniority in the bakery, Hubbartt's only reply was that she was the one who had been chosen to go and that she was terminated "as of now."

About five minutes later when Hinderliter was preparing to leave the store, Howard Cordts, supervisor of the meat department in the store, using vulgar language, said he had heard Hinderliter was fired. He also said that "none of his meat department was about to sign any cards for the Union."

After Hinderliter's departure from the store, the other bakery employees gathered to discuss her discharge. Supervisor Sherman who stated that he and the other bakery employees were "all shook up," inquired of the group whether the Union had been going around among them and if they had signed union cards. Although two bakery employees had, in fact, signed cards, only one responded affirmatively to Sherman's questions.

---

1. Retail Clerks Union, Local 418, Retail Clerk's International Association.

On the day when Hinderliter was discharged, store manager Hubbartt began circulating the information that an across-the-Board wage increase would be granted effective the next weekly pay period. This increase was, in fact, put into effect the following week. This resulted in higher pay for thirty-nine of the forty employees, including nine who had received ten to twenty cent raises in the preceding three months.

After the discharge of Hinderliter, the card-signing drive was carried on by Phillip Romo, a Union representative. By the middle of June, he had obtained signed cards from twenty-two of the forty employees.

On June 20, the Union wrote to the Company requesting recognition, offering to meet Company officials and to prove their majority "via card check conducted by any neutral third party." The Company replied stating "We do not believe that you lawfully represent our employees" and declined to meet with the Union.

■ We hold there is substantial evidence on the record as a whole to support the Board's finding that the Company discharged Margaret Hinderliter in violation of Section 8(a)(3) and (1) of the Act. Hinderliter was the only employee released in what was purported to be an economic layoff. She had been a satisfactory employee. Store manager Hubbartt said he had "never contested Margaret Hinderliter's ability to perform a job." Yet, he abruptly refused to write a recommendation letter which would explain the reason for her discharge.

■■ We further hold there is substantial evidence on the record which supports the finding of the Board that the Company violated Section 8(a)(1) of the Act by coercively interrogating its employees. We recognize that questioning of employees by officials of a company with reference to union activities is not a per se violation, but when such interrogation is coercive when viewed in the context of all the surrounding circumstances, a violation occurs. National

Labor Relations Board v. Wagner Iron Works, 7 Cir., 220 F.2d 126, 139; National Labor Relations Board v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 828. That is the case here.

■ We agree with the Board that the Company violated Section 8(a)(1) of the Act by raising wages in order to discourage union activities. Where an employer grants economic benefits during a union campaign for the express or calculated purpose of influencing employees' freedom of choice for or against a union, it is an unfair labor practice. National Labor Relations Board v. Frantz & Co., 7 Cir., 361 F.2d 180, 182.

As the Supreme Court stated: "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove." National Labor Relations Board v. Exchange Parts Company, 375 U.S. 405, 409–410, 84 S.Ct. 457, 460, 11 L.Ed. 435.

The only close question in this case is whether the Union properly obtained authorization cards from a majority of the Company's forty employees. The exclusion of two of the cards relied on by the Union would destroy the Union's card majority.

The Union's solicitor told various of the employees that the cards signed would be kept secret and involved no union obligation. The cards contained the words "Your confidence will be respected."

Marie Fonner, who herself aided in obtaining signatures, testified that Jerry Blue, a union representative, "* * * said get some of these cards signed and we will have an election." She also testified that she had not read the card at the time she signed it. Blue did not testify.

Fonner then obtained the signature of Virginia Frye and testified: "I had already told her that he brought the cards to be filled, to be signed for an election." "That's all I told her." Frye testified that Fonner told here the card was "to call an election." She explained her position: "I signed it [the card] to have an election * * * but it was my understanding that if we signed that we still

had a right to change our mind, that we didn't have to vote for the union even if we had signed the card."

Fonner also gave a card to Tom Boney. Boney testified that he was told by either Fonner or Hinderliter "that it is for a representative to come and talk to us about the union or to give us a chance to vote, something like that. I don't remember the exact words." Hinderliter said she did not say that to Boney.

In National Labor Relations Board v. Dan Howard Mfg. Co., 7 Cir., 390 F.2d 304 (1968), we pointed out that the Examiner and the Board assumed that the "sole" purpose rule announced in National Labor Relations Board v. Cumberland Shoe Corp., 6 Cir., 351 F.2d 917 (1965), required the use of the exact word "sole" or "only" by the organizer when he represented that the only purpose of the authorization card was to secure an election. We invited attention to a later Sixth Circuit case, National Labor Relations Board v. Swan Super Cleaners, 384 F.2d 609 (1967), where that Court expressly disavowed the view that *Cumberland* held that such precise words were necessary. In *Dan Howard*, we quoted from *Swan* to the effect that the *Cumberland* rule was not offended by invalidating cards whatever the style or wording of the solicitation "if it is clearly calculated to create in the mind of the one solicited a belief that the only purpose of the card is to obtain an election."

In *Dan Howard, supra,* 390 F.2d at page 309, we further stated: "The court [Sixth Circuit] pointed out that it is relevant to consider the subjective intention of the signer and his expressed state of mind in deciding whether a misapprehension was knowingly induced."

 Fonner testified that she was told to get the cards signed and we will have an election. There is no indication that she conveyed in any way to the union organizer that she understood that the Union could become her bargaining agent via a card majority and that an election would not necessarily be held. We hold that when this is the case and

the solicitor makes a statement relating only to an election but not to the card majority procedure, the "mental reservation" on the part of the solicitor is sufficient to knowingly induce a misapprehension. It is obvious that the signer, under such circumstances, would be left with the impression he would have the opportunity to vote.

 Fonner gave cards to Frye and Boney. Given her apparent understanding of the purpose of the cards, it is only realistic to assume that her words were clearly calculated to create in the mind of those solicited a belief that the only purpose of the card was to obtain an election. The testimony of Frye and Boney bear out this assumption. Fonner apparently did not realize she was inducing a misapprehension, but she did intentionally lead people to believe that which was in fact incorrect. We hold that under these circumstances, the cards are invalid.

We hold that at least the authorized cards of Marie Fonner, Virginia Frye and Tom Boney are invalid. It therefore follows that at the time the Union sought recognition, it did not represent a majority of the employees of the Company and there was, therefore, no violation of Section 8(a) (5) and (1) of the Act by the Company in not acceding to the Union's request for recognition.

Phillip Romo, a union organizer, was active in obtaining cards from employees. Phillip Wilhelm testified that in response to his question whether the card permitted the Union to represent him without an election, Romo said "No, this just gives us the right to hold an election in the store." David Bauer testified the Union man said: "He told me if we had enough cards he could get an election." Betty Sorenson testified the purposes of the card were explained to her—"It was to get an election into the store." Thelma Duncan testified: " * * * he said there would be an election at the store, there'd be a booth set up in the back and there'd be an election."

Romo testified that "As in all other cases I stressed both possibilities of bringing in the union, either card check or by the election." The Trial Examiner indicated "I am convinced that though these employees may not have fully understood what Romo was trying to tell them, this was not due to misrepresentation on his part." To say that these employees did not "fully" understand is certainly an understatement.

We need not comment additionally on these later-mentioned cards except to say that the testimony indicates the need for care on the part of a solicitor in order to avoid the misapprehension that was evident here.

The portion of the Board's order based upon a violation of Section 8(a) (1) and of Section 8(a) (3) and (1) of the Act will be enforced. The portion of the order based on the finding of a Section 8(a) (5) and (1) violation will be denied.