NEMITZ ET AL., PLAINTIFFS, *v.* NORFOLK & WESTERN RY. CO., DEFENDANT, AND THIRD PARTY PLAINTIFF *v.* BROTHERHOOD OF RAILROAD TRAINMEN, THIRD PARTY DEFENDANT.

[Cite as Nemitz v. Norfolk & Western Ry. Co. (1969), 23 Ohio Misc. 78.]

(No. C 68-13—Decided December 19, 1969.)

United States District Court, Northern District, Western Division.

*Mr. Thomas Murray*, for plaintiffs.
*Mr. John M. Curphey* and *Mr. E. Thomas Maguire*, for defendant Norfolk and Western Railway Co.
*Mr. Robert Hart*, for defendant Brotherhood of Railroad Trainmen.

YOUNG, J.  On October 16, 1964, the New York, Chicago & St. Louis Railway (hereinafter referred to as the Nickel Plate) was merged into the Norfolk & Western Railway (hereinafter referred to as the N & W) with the N & W as the surviving entity.  The transaction involved the assumption of control of several smaller lines by the combined company.  Among these was the so-called Sandusky Line from Columbus, Ohio, to Sandusky, Ohio, purchased from the Connecting Railroad which was a subsidiary of the Pennsylvania Railroad[1] (hereinafter referred to as the Pennsy).  The Sandusky Line, although legally a separate entity, had been operated as a part of the Toledo

---

[1] It is interesting to note that the Pennsy at that time controlled the N & W by virtue of ownership of a large portion of its stock.  It is also interesting to note that the President of the N & W at the time of the merger was soon thereafter made President of the Pennsy.

Division of the Pennsy. The seniority district of at least one union, The Brotherhood of Railroad Trainmen here involved, embraced the entire Toledo Division. Trainmen not able to find work on the Sandusky Line could and according to the undisputed evidence did indeed seek work at other points in the Toledo Division.

The effect of the merger was to split this seniority district, thereby limiting the Sandusky Line employees to the work available on the Sandusky Line alone. It is this splitting of the seniority district which laid the basis for the present controversy.

The Sandusky Line, while carrying a large amount of agricultural products and general merchandise, was heavily employed for transporting coal to the Pennsy's coal docks at Sandusky. Navigation on Lake Erie being primarily a seasonal matter, much of the employment on the Sandusky Line was seasonal in nature. In light of the total wages which the plaintiffs claim to have received on the Pennsy, the ability to work throughout the Toledo Division must have been of great economic importance to them.[2]

The N & W was desirous of obtaining the Sandusky Line since it provided a much needed connection between the existing N & W rail head at Columbus and the Nickel Plate system. Since the N & W was primarily a coal carrier, it had the added advantage of providing the N & W with single line potential for its coal shipments, thereby eliminating rate sharing.

At the time of the merger the employees of the Sandusky Line were given the option of going with the N & W or remaining in the employment of the Pennsy. Where an employee elected to take employment with the Pennsy, the Pennsy employee displaced thereby would have the option of electing to take employment with the N & W on the same terms as the employee who displaced him.

Prior to the completion of the merger the unions en-

---

[2]Plaintiff Richard Nemitz received a total wage from the Pennsy in the 12 months preceding October 16, 1964, of $7,000 and after the merger he earned on the Sandusky Line in the 24 month period following October 16, 1964, an amount of $3,303.13.

tered into an agreement with the N & W regarding protective provisions for the employees affected by the merger. These are before the court as joint exhibits 1 through 4. Such agreements are entered into to provide the basis for the protective order which the Interstate Commerce Commission (hereinafter referred to as the I. C. C.) is required to enter by statute. 49 U. S. Code, Section 5(2)(f) reads:

As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interest of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

These agreements applied to all the employees on all of the lines affected by the merger with the exception of the A. C. Y. R. R. and the Pittsburgh & West Virginia R. R. The Commission adopted them as part of its protective order:

Based upon studies made on the Norfolk & Western, Nickel Plate, and Wabash for the 5-year period 1956 through 1960 respecting the usual turnover in employment by reason of retirements, resignations, deaths, and dismissals for cause, it appears that the proposed merger, lease,

and purchase would have little or no adverse effect on the carriers' employees. The studies reveal that the turnover, termed "normal attrition," average 4,314 employees annually for the 5-year period. Based upon that average and the plan of operation to be undertaken by the new system, applicants expect that substantially more jobs will become available on the combined system within one year after the unification than the net number of jobs expected to be eliminated as a result thereof.

Norfolk & Western has entered into an agreement with 19 of the principal labor organizations, members of the Railway Labor Executives' Association, for the protection of employees of Norfolk & Western, Nickel Plate, and Wabash, as well as persons employed on the Sandusky line of Pennsylvania, represented by these organizations. This agreement, which provides for the assumption by Norfolk & Western of all outstanding labor contracts, schedules and agreements of Nickel Plate and Wabash, as well as those having application on the Sandusky line, basically requires that job eliminations as a result of the unification be accomplished only through normal attrition. Under its terms, Norfolk & Western agrees to take into its employment, upon consummation of the merger, lease, and purchase, all employees of the lines involved with the guarantee that they will not be adversely affected in their employment as a result of the proposed transactions or for any reason other than furloughs due to seasonal requirements or a decline in volume of traffic or revenue.

* * *

It was stipulated that under any report and order approving the proposed merger, lease, and purchase it may be considered that these agreements were made pursuant to and in conformity with Section 5(2)(f), of the act for the protection of the covered employees. Joint Exhibit 6 pp. 89-90.

The principal agreement between the N & W and the unions was signed on April 16, 1962, and was effective according to its terms on January 10, 1962, but did not actually go into effect until the merger was consummated. The agreement provides that the employees shall be entitled to

the protection afforded by the Washington Job Protection Agreement and provided additional special arrangements for employees of the various carriers involved. Section 3 of this agreement provides:

On the effective date of the acquisition by Norfolk & Western of the Sandusky Line presently operated by the Pennsylvania Railroad, approval for which is sought in Finance Docket No. 21512, Norfolk & Western will take into its employment all employees represented by the labor organizations signatory hereto, except those on furlough or leave of absence as of the effective date of this Agreement or subsequent thereto up to and including the date the merger is consummated, who during such period have exercised employment rights on said Sandusky Line and elect to accept such employment; provided, however, that in the event two or more employees, including those on leave of absence, have employment rights to the same job, said employees will be protected hereunder and their employment preserved only to the extent of their individual equities in said job; and provided further, however, that none of such employees shall be deprived of employment or placed in a worse position with respect to compensation at any time during such employment except that Norfolk & Western shall not be required to provide employment to any such employee during any year, commencing on the effective date of said acquisition, of greater duration than such employee enjoyed on said line in the twelve months' period immediately preceding the effective date of said acquisition. In the event any such employee elects not to accept such employment and in lieu thereof exercises employment rights on the Pennsylvania Railroad, Norfolk & Western agrees to offer employment to the employee of the Pennsylvania Railroad ultimately displaced by the return of said employee, who elects to accept such employment. Pennsylvania Railroad employees accepting such employment shall be entitled to all the protective benefits of this Section provided that Norfolk & Western shall not be required to provide employment or compensation to any such employee during any year, commencing on the effective date of such acquisition, of greater duration or

amount than was performed by and paid to the Sandusky Line employee, who caused such Pennsylvania Railroad employee to be displaced, in the twelve months' period immediately preceding the effective date of said acquisition.

Employees protected under this Section shall not be regarded as deprived of employment or placed in a worse position with respect to compensation in case of their resignation, death, retirement, dismissal for cause in accordance with existing agreements, failure to work due to disability or discipline in accordance with existing rules or agreements or furlough because of reduction in forces due to seasonal requirements as aforesaid or decline in volume of traffic or revenues.

The method of determining the protective benefits was set forth in Joint Exhibit 4 which was dated January 10, 1962, and basically provided for determination of the average monthly compensation of the employee for the last 12 months before the merger in which he performed service and supplementing monthly earnings each month to reach that amount. This agreement likewise was drawn to cover all of the employees of all of the carriers affected by the merger.

The dispute before this court is basically that the plaintiffs claim that they have not received all of the protective benefits to which they are entitled. The N & W has disputed this and has questioned the jurisdiction of this court to hear this controversy. The court has previously ruled that this matter does not have to be submitted to arbitration under the Railroad Labor Act or under the I. C. C. order and will adhere to that ruling insofar as it pertains to the basic dispute. There are, in addition, several other jurisdictional questions on which the court has not had the benefit of extensive briefing by counsel, but which the court will undertake to resolve as it reaches that portion of its analysis of the dispute.

Basically, the N & W claims that it has an agreement executed pursuant to the last sentence of 49 U. S. Code, Section 5(2)(f) providing for the determination of protective benefits on the basis of plaintiffs' Sandusky Line earnings alone. Plaintiffs, the employees represented by the

Brotherhood of Railroad Trainmen, claim that they are entitled to payments based upon their earnings for the entire Toledo Division prior to the merger.

The question of whether 49 U. S. Code, Section 5(2)(f) prescribes a minimum level of compensation appears to be one of first impression in the courts. The Supreme Court in *Railway Labor Executives Ass'n* v. *United States* (1950), 339 U. S. 142, determined that the four-year provision in the second sentence of 49 U. S. Code, Section 5(2)-(f) prescribed the minimum duration of the protective benefits afforded by the carriers and the I. C. C. The Supreme Court was called upon to determine whether 49 U. S. Code, Section 5(2)(f) required a "job freeze" for a four-year period following a merger. *Brotherhood of Maintenance of Way Employees* v. *United States* (1961), 366 U. S. 169. The court there determined that the Congress did not intend a "job freeze," but that the compensation alone was required. In reaching this conclusion the court reviewed the legislative history of the act and the interpretations given to the act by those most affected at the time of the passage of the bill. The result appears in the opinion as footnotes 7 and 8. *Ibid.* at 176-77. This clearly shows that Conference Committee Chairman Lea and the Brotherhood of Maintenance of Way Employees believed that the provision guaranteed the affected employees income for four years after the merger whether they were employed or not.

The I. C. C. promulgated certain conditions known as the Oklahoma Conditions which form the basis of all I. C. C. protective orders since the passage of 49 U. S. Code, Section 5(2)(f).[3] After being partly reversed in the im-

---

[3]Oklahoma Ry. Co.—Trustees Abandonment, 257 I. C. C. 177 (1964). These conditions provide in part:

"Section 4. If, as a result of the abandonment of operation herein permitted, * * *, any employee, * * *, is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a monthly displacement allowance equal to the differ-

position of these conditions by the Supreme Court in *Railway Labor Ass'n* v. *United States* (1950), 339 U. S. 142, the I. C. C. amended the Oklahoma Conditions by the addition of the Washington Job Protection Agreement with the Oklahoma Conditions as a minimum. *New Orleans Passenger Terminal Cases* (1952),' 282 I. C. C. 271. The resulting conditions became known as the New Orleans Conditions. It was these conditions which were involved in *Brotherhood of Maintenance of Way Employees* v. *United States* (1961), 366 U. S. 169. There the court described the conditions as follows:

"Briefly, the New Orleans Conditions prescribe the following: employees retained on the job but in a lower paying position get the difference between the two salaries for four years following the merger; discharged employees get their old salaries for four years, less whatever they make in other jobs, or they may elect a lump sum payment; transferred employees get certain moving expenses, and certain fringe benefits are insured; and any additional benefits that a given employee would have received under the Washington Job Protection Agreement, \* \* \*, are guaranteed." *Brotherhood of Maintenance of Way Employees* v. *United States* (1961), 366 U. S. 169, 171 n. l.

When all of these factors are taken together, particularly in light of the fact that the Oklahoma Conditions were promulgated at a time when the I. C. C. believed that the four-year provision of 49 U. S. Code, Section 5(2)(f) was considered to prescribe the maximum protective benefits

---

ence between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced." 257 I. C. C. at 197.

There is also a provision for wage guarantee if he leaves employment providing that the guarantee (which itself is a rough rule of thumb on how much will be lost by taking new employment) shall be paid only to bring the wages up to the point they were at at the time of the merger.

"'The Oklahoma conditions differ [from the Washington Job Protection agreement] in that they prescribe 100% protection [of wages] for a maximum period of 4 years from the effective date of the Commission's order." *New Orleans Passenger Terminal Cases* (1952), 282 I. C. C. 271.

allowable, this court is compelled to the conclusion that 49 U. S. Code, Section 5(2)(f) requires a wage freeze for four years after the consummation of the merger as the minimum protective benefits.

It now becomes necessary for this court to determine whether this wage freeze applies only to those wages earned on the Sandusky Line or pertains to the entire earnings of the plaintiffs throughout the Toledo Division of the Pennsy. Again, no court has reported a case involving protective benefits arising from the sale of a portion of a railroad which split a seniority district. As far as the plaintiffs are concerned, the sale of the Sandusky Line by the Pennsy to the N & W is the same as if the Pennsy had been merged into the N & W and all of the Pennsy Toledo Division lines except the Sandusky Line had been abandoned. There could be no dispute that the plaintiffs' protective benefits would be calculated on the basis of their entire earnings in the Toledo Division, not just on that portion of the division which had not been abandoned, namely, the Sandusky Line. Plaintiffs in the case before the court are precluded from working throughout the Toledo Division just as surely as they would be in the hypothetical case. To draw a distinction between the instant case and the hypothetical would be to do violence to the intent of Congress in enacting this statute and to place the form of the transaction over the substance of the merger. The court holds that 49 U. S. Code, Section 5(2)(f) requires that the N & W calculate plaintiffs' protective benefits on the basis of plaintiffs' earnings for the entire Toledo Division.

Attention must now be turned to whether defendant's position that protective benefits are to be calculated on the basis of Sandusky Line earnings alone is frozen into the I. C. C. order, which would divest this court of jurisdiction.[5] The court has heretofore set forth the language of the I. C. C.'s order and the language of the agreement be-

[5]Cases to review an I. C. C. order pursuant to 28 U. S. Code, Section 1336, must be brought by or against the United States, 28 U. S. Code, Section 2322, and must be filed within 90 days after the date the Commission order becomes final, 28 U. S. Code, Section 1336(c).

tween the union and the carriers which the I. C. C. incorporated as part of its order. The I. C. C. interpreted the agreement between the unions and the N & W to say that "* * * Norfolk & Western agrees to take into its employment, upon consummation of the merger, lease, and purchase, all employees of the lines involved with the guarantee that they will not be adversely affected in their employment as a result of the proposed transactions or for any reason other than furloughs due to seasonal requirements or a decline in volume of traffic or revenue." Joint Exhibit 6, p. 89. The I. C. C. is referring to the language in Joint Exhibit 1 which states "* * *, that none of such employees shall be deprived of employment or placed in a worse position with respect to compensation at any time during such employment except that Norfolk & Western shall not be required to provide employment to any such employees during any year, commencing on the effective date of said acquisition, of greater duration than such employee enjoyed on said line in the twelve months' period immediately preceding the effective date of said acquisition * * *."

"Employees protected under this Section shall not be regarded as deprived of employment or placed in a worse position with respect to compensation in case of * * * furlough because of reduction in forces due to seasonal requirements as aforesaid or decline in volume of traffic or revenues." Joint Exhibit 1, pp. 9-10.

It appears from this that the I. C. C. order contemplated that plaintiffs' total wage could be reduced because of seasonal furlough or decline in revenue, but not because of the merger. Whether this complies with the court's interpretation of 49 U. S. Code, Section 5(2)(f) is a question which this court is without jurisdiction to consider since the action was not timely commenced, 28 U. S. Code, Section 1336(c), and because it was not properly brought, 28 U. S. Code, Section 2321 et seq. This court must thus accept the I. C. C. provisions as being correct.

The loss of compensation due to the inability of the plaintiffs to perform work throughout the Toledo Division

is not proximately caused by the seasonal requirements of defendant or a decline in volume of traffic or revenue. Rather it is the result of the merger narrowing the seniority district to the Sandusky Line alone. Plaintiffs are thus entitled to damages pursuant to 49 U. S. Code, Section 9 to the extent that their compensation has been diminished by the inability to perform work throughout the Toledo Division. They are not entitled to damages however for the extent that their compensation has been diminished by furlough due to seasonal requirements or because of any decline in volume of traffic or revenue which may have occurred.

The jurisdiction of this court to entertain such a suit lies under 28 U. S. Code, Sections 1331, 1336, 1337, 2321, and 49 U. S. Code, Section 9.

This court is not unaware that the language of Joint Exhibit 1 says that employees shall not be placed in a worse position with respect to their employment except due to furloughs on account of seasonal requirements or decline in traffic or revenue, and that the language of Joint Exhibit 1 (p. 9) clearly differentiates between employment and compensation in another paragraph of the same section. The court, however, will construe this in the light which provides the least coverage, noting that the language of 49 U. S. Code, Section 5(2)(f) only speaks of employment but the term as therein used has been used to cover both employment and compensation. While this construction results in an inconsistency in the use of terms within Joint Exhibit 1, it is not the court's intention that this construction be considered the determination of the actual intent of the parties.

The function of the court in this case is not to construe totally and definitively the agreement between the defendant and the union which was adopted by the I. C. C. as its protective order; rather the court's function is to delineate the minimal requirements of the law and the I. C. C. order in a situation where defendant's course of conduct with respect to the protective benefits guaranteed plaintiffs has not been in compliance with the law or the I. C. C. order.

But the function of the court is not to go beyond requirements of the law and the reasons why it finds non-compliance with the law. The interpretation of the agreement between the carrier and the union and of the I. C. C. order as to meaning consistent with law, is a matter which is to be left to arbitration according to the I. C. C. order as provided in Joint Exhibit 1 (pp. 7-8). *Arnold* v. *Louisville & Nashvile R. R.* (M. D. Tenn. 1960), 180 F. Supp. 429, aff'd. sub nom. *Batts* v. *L. & N. R. R.* (6th Cir. 1963), 316 F. 2d 22.

Defendant will contend that Joint Exhibit 10 represents an agreement entered into pursuant to the last sentence of 49 U. S. Code, Section 5(2)(f) which reads:

"* * * Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

Assuming that this does constitute an agreement, and assuming that it provides for protective benefits to be calculated as the N & W claims that they are to be calculated, the court is faced squarely with the question of whether such an agreement is to be enforced.

Numerous other courts have had opportunities to address themselves to this question: *e. g., O'Mara* v. *Erie Lackawanna R. R.* (2d Cir. 1969), 407 F. 2d 647; *Flaherty* v. *Kansas, Oklahoma & Gulf R. R.* (E. D. Okla. 1966), 252 F. Supp. 736; *Roberts* v. *Lehigh & New England R. R.* (3d Cir. 1963), 323 F. 2d 219. The courts in these cases simply assumed that the agreement was in compliance with the statute and proceeded to consider whether this provision of the statute permitted the carrier and the union to change the I. C. C. order. In all of these cases it was held that it did. The ability to entirely rewrite the protective agreement does not necessarily imply the ability to lessen the Congressionally established minimum protection.

The court in *Arnold* v. *Louisville & Nashville R. R.* (M. D. Tenn. 1960), 180 F. Supp., 429, aff'd sub nom., *Batts*

v. *L. & N. R. R.* (6th Cir. 1963), 316 F. 2d 22, interpreted the provision of the statute in question as follows:

"Thus, while the statute requires the Commission to make provisions for the protection of employees adversely affected, it specifically reserves to the railroad employees the right, through their duly authorized representatives, to enter into an agreement with the railroad as to terms, conditions and arrangements for their own protection. Under this provision of the statute, as the Court construes its meaning and effect, the employees may, through a collective bargaining agreement with the railroad, make provisions for their own protection by *adopting, supplementing* or *implementing* the provisions made by the Commission for their protection." 180 F. Supp. at 433-34. (Emphasis added.)

This interpretation of the statute was adopted by the District Court in *Clemens* v. *Central R. R. of New Jersey* (E. D. Pa. 1967), 264 F. Supp. 551, *rev'd on other grounds,* 399 F. 2d 825 (3d Cir. 1968). This court accepts this interpretation, that is, that the agreement can alter, supplement, or vary the I. C. C. order so long as it does not abridge the protection afforded by the statute or the I. C. C. order.⁶

The language of the statute supports this interpretation. The first clause of the sentence reads "Notwithstanding any other provisions of this chapter * * *." This would seem to mean notwithstanding any provision of this chapter other than Section 5(2)(f). As such it would seem to guarantee to the unions the rights to make agreements respecting protective benefits which might otherwise be construed to be solely a power of the I. C. C. Unfortunately the legislative history does not appear to shed any light on this question.

---

⁶The court realizes that an agreement may in changing the protective benefits lessen the protection as to certain classes of employees, without really altering the total level of protection. The courts should view such diminution of protective benefits with disfavor and such should only be permitted to stand if, when viewed in light of the entire scheme of protection as modified by the agreement in question, the diminution is benign.

Finally, it must be realized that the economic policy underlying 49 U. S. Code, Section 5(2)(f) is very strong. A study of the history of this legislation in the House of Representatives reveals that adequate economic protection for those displaced in mergers was one of the main concerns of Congress in passing this legislation. To permit this policy to be undermined by agreements between the carriers and the unions would do violence to the Congressional scheme. The court will hold that if the union and the N & W did reach the agreement which is embodied in Joint Exhibit 10, that agreement is unenforceable and void as against manifest public policy.

There has been talk of there being an accord and satisfaction which disposed of this case. The N & W has urged that there was an oral settlement of the claims coupled with Joint Exhibit 10 and several letters. This was reached by the N & W in negotiation with plaintiffs' union. What has been said with regard to Joint Exhibit 10 alone applies equally to any such agreement. Thus only an accord reached with each individual plaintiff may survive under the law. Defendant does not contend that there ever were such accords. This obviates the necessity of passing on whether any such agreement is in compliance with the statute of frauds or whether the statute of frauds applies.

Finally we come to the question of damages. This case could have been tried as a case for declaratory judgment pursuant to 28 U. S. Code, Section 2201. Even where declaratory relief is not requested the courts may grant such relief where the pleading and proof show such to be appropriate. *Katzenbach* v. *McClung* (1964), 379 U. S. 294; *Hunkin-Conkey Const. Co.* v. *Pennsylvania Turnpike Commission* (M. D. Penn. 1940), 34 F. Supp. 26. Once the court has determined that the defendant's position is not in accord with the law or the I. C. C. order and that Joint Exhibit 10 is unenforceable, the case appears to be one of a grievance arising under the I. C. C. order and thus susceptible to the arbitration clause contained therein. *Arnold* v. *Louisville & Nashville R. R.* (M. D. Tenn. 1960), 180 F. Supp. 429, aff'd sub nom. *Batts* v. *L. & N. R. R.* (6th Cir.

1963), 316 F. 2d 22. As such the court will defer the exercise of its jurisdiction to the arbitration process. The question of whether the loss of wages of each individual plaintiff resulted from the loss of the ability to work throughout the Toledo Division or from furlough due to seasonal requirements or loss of volume of traffic or of revenue, is a question which is particularly amenable to arbitration. Therefore the court will order that the parties arbitrate this question in compliance with the I. C. C. order.

The disposition of this portion of the case does not necessarily dispose of the third party complaint by the N & W against the Brotherhood of Railroad Trainmen. The parties should inform the court before the 15th of January whether they desire to proceed with that portion of the cause.

Plaintiffs shall prepare an order in compliance with Rule 4(a) of the Rules of the United States District Court for the Northern District of Ohio.

*Judgment accordingly.*